***EFILED***
Case Number 2020L 001397
Date: 10/1/2020 4:27 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

|  |  |  |
|---|---|---|
| JOSEPH BEARDSLEY, INDIVIDUALLY | ) | |
| AND AS SPECIAL REPRESENTATIVE OF | ) | |
| THE ESTATE OF REBECCA BEARDSLEY | ) | |
| And | ) | |
| MICHELE KIPNIS, | ) | |
|  | ) | |
|     Plaintiffs | ) | |
|  | ) | |
|     v. | ) | |
|  | ) | |
| ABBVIE INC | ) | 2020L 001397 |
|  | ) | |
| *Serve at:*   Corporate Creations Network Inc | ) | |
|     350 S. Northwest Hwy, Suite 300 | ) | Cause No: |
|     Park Ridge, IL 60068 | ) | |
|  | ) | |
|  | ) | |
| APOLLO ENDOSURGERY US, INC. | ) | |
|  | ) | |
| *Serve at:*   National Registered Agents, Inc. | ) | |
|     208 South LaSalle Street, #814 | ) | |
|     Chicago, IL 60604 | ) | |
|  | ) | |
|     Defendants | ) | |

**COMPLAINT**

COME NOW Plaintiffs, by and through their undersigned attorneys, and for their

Complaint, state as follows:

**PARTIES**

*I. Plaintiffs*

1. Plaintiff Joseph Beardsley (hereinafter "Plaintiff") is a resident of the State of California. At

    all times relevant hereto he was lawfully married to Decedent Rebecca Beardsley (hereinafter

    "Decedent").  Decedent Rebecca Beardsley had a Lap-Band® device implanted at Balboa

Naval Medical Center in San Diego, California, on or about April 1, 2011.  On or about December 27, 2018, the Lap-Band® device was caused to be surgically removed from Decedent at Loma Linda University Medical Center in San Diego, California. During the removal of Decedent's Lap-Band® on, it was noted that the Lap-Band® catheter had wrapped around her small intestines causing a bowel obstruction which necessitated emergency removal of the lap band and port.  It was also discovered that the Lap-Band had eroded into her stomach causing sepsis, stomach perforation and necrosis.  Decedent died of the injuries caused by her Lap-Band on December 28, 2018.

2. Plaintiff brings this action pursuant to 740 ILCS 180, 755 ILCS 5/27-6, and 820 ILCS 310/1.1 (as amended) and other common law causes of action.

3. Plaintiff Michele Kipnis is a resident of Del Mar, California.  Plaintiff Michele Kipnis had a Lap-Band® device implanted at Scripps Memorial Hospital La Jolla located in La Jolla, CA on or about October 8, 2012 and/or on or about September 5, 2018 the Lap-Band® device was caused to be surgically removed from Kipnis at Scripps Memorial Hospital La Jolla located in La Jolla, CA. During the removal of Michele Kipnis' Lap-Band® on or about it was determined that the Lap-Band® had eroded into her stomach causing inflammation of her liver and stomach which prevented her from eating, caused daily vomiting, a hernia and chronic diarrhea.

4. Hereinafter, all plaintiffs set forth above will be collectively referred to as "Plaintiffs."

## II. Defendants

5. Defendant AbbVie Inc., (hereinafter "AbbVie") is a for-profit corporation, incorporated under the laws of the State of Delaware.  AbbVie is a multi-specialty healthcare company with its principal place of business located at 1 North Waukegan Road, North Chicago, Illinois

60064. AbbVie is the successor to Allergan USA, Inc., which was acquired by AbbVie on or about May 8, 2020. Defendant AbbVie is authorized to and does business throughout the State of Illinois.

6. In approximately 2006, AbbVie, by and through its predecessor Allergan, acquired the Lap-Band® System with its purchase of Inamed Corporation. The purchase included BioEnterics Corporation, a subsidiary that was responsible for introducing the Lap-Band® System product line to the United States. BioEnterics Corporation had previously sold an adjustable gastric banding system for morbid obesity in Europe and Australia. Since 2006, Allergan has been engaged in the business of designing, testing, manufacturing, assembling, packaging, labeling, distributing, selling, and marketing the Lap-Band® for use by surgeons performing surgical operations of members of the general public. In 2013, Allergan USA, Inc. sold the rights to the Lap-Band® System to Defendant Apollo Endosurgery, Inc.

7. Defendant APOLLO ENDOSURGERY US, INC. (hereinafter, "Apollo") now is, and at all times relevant to this action was, a for-profit corporation, incorporated under the laws of the State of Delaware. Apollo is a medical device company focused on less invasive therapies for the treatment of obesity with its principal place of business located at 1120 South Capital of Texas Highway #300, Austin, Texas 78746. Defendant AbbVie is authorized to and does business throughout the State of Illinois, and Apollo, in fact, does business throughout the State of Illinois.

8. In approximately October 2013, Apollo purchased Defendant Allergan's obesity intervention division for up to $110 million, which included the Lap-Band® product line.

9. Hereinafter, Apollo and AbbVie will be referred to collectively as "Lap-Band® Defendants. Hereinafter, all defendants set forth above will be collectively referred to as "Defendants."

## **JURISDICTION AND VENUE**

10. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, this Court has in personam jurisdiction over Defendants, because Defendants are present or domiciled in the State of Illinois, such that requiring an appearance does not offend traditional notions of fair play and substantial justice.

11. This Court has general personal jurisdiction over Defendants pursuant to and consistent with 735 ILCS 5/2-209, and the United States and Illinois Constitutional requirements of Due Process, in that the Defendants, individually or acting through their apparent agents, committed one or more of the following acts:

   a. Defendants transacted business in the State of Illinois, 735 ILCS 5/2-209(a)(1); and/or

   b. Defendants committed, a tortious act within the State of Illinois 735 ILCS 5/2-209(a)(3); and/or

   c. At all relevant times, it was foreseeable to Defendants that their tortious acts and/or their transaction of business in the State of Illinois would have consequences such that Defendants could reasonably foresee being haled into court in the State of Illinois, and/or

   d. Requiring Defendants to litigate this claim in the State of Illinois does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

12. There is no federal subject matter jurisdiction because there is no federal question raised.

13. The Lap-Band® Defendants, at all relevant times, have engaged in substantial business activities within the State of Illinois.  At all relevant times the Lap-Band® Defendants transacted, solicited, and conducted business in Illinois through their employees, agents, and/or sales representatives, and the Lap-Band® Defendants derived substantial revenue from such business by marketing The Lap-Band® to people of the State of Illinois.

14. The Lap-Band® Defendants had substantial contacts with physicians in Illinois including, based upon information and belief, contacts through marketing to physicians to encourage physicians to use the Lap-Band® device and marketing of the product to consumers, within the State of Illinois.

15. There is no federal subject matter jurisdiction because there is no federal question raised. Plaintiffs' claims in this action are brought solely under Illinois law.  To the extent Plaintiffs relies upon federal law or regulation governing the design, manufacture, and/or sale of a medical device, Plaintiffs do so for the purposes of properly pleading "parallel" state law claims as recognized by the Supreme Court of the United States.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996).

## UNDERLYING COMMON FACTS

### I. *Description of the Lap Band®*

16. The Lap-Band® is a Class III medical device designed as a long-term, surgically implantable device intended to induce weight loss in morbidly obese patients by limiting food consumption.  The Lap-Band® is manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and sold by the Lap-Band® Defendants.

17. The Lap-Band® components include the silicone elastomer band, an access port, and tubing used to connect the band and port, as shown below.



The LAP-BAND Adjustable Gastric Banding System

18. At all times relevant to this Complaint, in order to be eligible for a The Lap-Band® device, patients were supposed to have a Body Mass Index (BMI) of at least 40 or a BMI of 35 with at least one obesity-related health condition, or those who are 100 pounds over their ideal weight.  Patients were also supposed to have been overweight for more than 5 years and have previously failed more conservative weight loss techniques.  Those who undergo the procedure must be prepared to make extreme changes in eating habits and lifestyle for the remainder of their lives.

19. During surgery, a surgeon wraps the band around the upper part of the stomach, creating a small pouch that can hold only a small amount of food.  The narrow opening of the stomach pouch (stoma) limits how quickly food passes to the lower part of the stomach.  Fullness is supposed to be achieved with just a small amount of food.

## II. *History of the Lap-Band®*

20. The Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c, *et seq.*, to the Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, "impose[] a

regime of detailed federal oversight" administered by the Food and Drug Administration ("FDA").

21. Class III devices are those that "present a potential, unreasonable risk of illness or injury," among other things.

22. Premarket Approval ("PMA") is the process the FDA uses to evaluate the safety and efficacy of medical devices, such as The Lap-Band®.

23. PMA applications can contain thousands of pages of information. A PMA application must include the device's indications for use, description, marketing history, manufacturing process, and a summary of studies, just to name a few. *See* 21 C.F.R. § 814.20.

24. The FDA may grant PMA for a medical device only if it finds, *inter alia*, that:

   1. There is a "reasonable assurance" of the device's "safety and effectiveness" under the conditions of used included in the proposed labeling for the device; *and*

   2. The proposed labeling is neither false nor misleading. 21 U.S.C. § 360e(d)(1)(A), (2)(A), (B), and (D).

25. Once a device receives PMA, it "may not be manufactured, packaged, stored, labeled, distributed or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 C.F.R. § 814.80.

26. The Lap-Band® System has been in use in Australia and Europe since 1993. Over 750,000 The Lap-Band® Systems have been distributed globally, and it has been widely reported on in medical literature.

27. The Lap-Band® Defendants initially sought FDA PMA in the late 1990s.  On or about

March 24, 2000, BioEnterics Corporation, a subsidiary of Inamed Corporation, submitted its

application for PMA of the Lap-Band® system with the Food & Drug Administration (FDA).

28. Initial PMA was denied by the Center for Devices and Radiological Health ("CDHR") in

August 2000, following the recommendation of the Gastroenterology and Urology Devices

Panel.  The denial was based on inadequate clinical support for the safety and efficacy of the

device and inadequate safety information regarding esophageal dilation.  CDHR

recommended expanded follow-up, updated and/or amended device labeling, and post-

approval study.

29. On June 5, 2001, the FDA approved BioEnterics PMA application with a list of conditions

that Allergan, Inc. had to fulfill in order to maintain The Lap-Band® approval.  These

conditions included:

    a.  The submission of periodic reports, required under 21 C.F.R. 814.84, at intervals

       of one year from the date of approval of the original PMA.  Pursuant to 21 C.F. R.

       814.84, Lap-Band ®  Defendants were required to file a summary and

       bibliographs of the following:

        1.  Unpublished reports of data from any clinical investigations or nonclinical
           laboratory studies involving the device or related devices and known to or that
           reasonable should be known to the applicant; and
        2.  Reports in the scientific literature concerning the devices and known to or that
           reasonable should be known to the applicant.

    b.  The submission of "Adverse Reaction and Device Default Reporting". As noted

       in the 2001 PMA approved letter to BioEnterics Corporation, the FDA determined

       that in order to provide continued reasonable assurance of the safety and

       effectiveness of the device, the Lap-Band® Defendants were required to submit

"Adverse Reaction Reports" or "Device Defect Reports" to the FDA. The Lap-Band® Defendant were required to submit the reports within 10 days after the Lap-Band® Defendants receives or has knowledge of information concerning:

    a) Any adverse reaction, side effects, injury, toxicity or sensitivity reaction that is attributable to the device, and

        i. Has not be addressed by the devices labeling or,

        ii. Has been addressed by the devices labeling but is occurring with unexpected severity or frequency.

    c. Reporting adverse events under the Medical Device Reporting (MDR) Regulation if The Lap-Band® may "have caused or contributed to a death or serious injury; or [h]as malfunctioned and…would be likely to cause or contribute to a death or serious injury if the malfunction were to recur;" and

    d. Include in its Annual Report any failures of the device that meet the specifications outlined in the PMA that would have been correctable by procedures described in the Lap-Band® labeling.

30. In addition to the Annual Report requirements, the Lap-Band® Defendants were also required to complete two post approval studies that evaluated the long-term effectiveness of the device and the incidence of adverse events. The Lap-Band® Defendants were also required to ensure that their representations and warranties were consistent with both Federal and State law.

31. Lap-Band® Defendants were required to comply with all state and federal laws, including but not limited to:

    a. **21 U.S.C. § 352(q)**: **21 U.S.C. § 352(q)** provides that a medical device is misbranded "if (1) its advertising is false or misleading in any particular, or (2) it is sold, distributed, or used in violation of regulations prescribed under section

360j(e) of this title." *Id.* Section 321(n) states that where there is an allegation of

misbranding:

> [I}n determining whether the labeling or advertising is misleading there
> shall be taken into account (among other things) not only representations
> made or suggested by statement, word, design, device, or any
> combination thereof, but also the extent to which the labeling or
> advertising fails to reveal facts material in the light of such
> representations or material with respect to consequences which may
> result from the use of the article."

b. **21 C.F.R. § 803.50,** *et seq.***:**  The Lap-Band® Defendants were required to report

to the FDA no later than thirty calendar days after the day The Lap-Band®

Defendants receive or become aware of information suggesting that The Lap-

Band® caused or contributed to a death or serious injury.  The Lap-Band®

Defendants must also report to the FDA if The Lap-Band® had malfunctioned, and

that malfunction would be likely to cause death or serious injury if it were to

reoccur.  The Lap-Band® Defendants must conduct an investigation of the

malfunction and determine the cause.

c. **21 C.F.R. § 814.80:**  The Lap-Band® Defendants were required to manufacture

the Lap-Band® device "according the approved specifications for the medical

device[.]"

d. **21 C.F.R. § 814.82(a)(9):**  The Lap-Band® Defendants were required to

continuously evaluated and report on the safety, and reliability of The Lap-Band®

for its intended use.

e. **21 C.F.R. §§ 820.20, 820.100:**  The Lap-Band® Defendants were required to

establish a quality management policy and instructions with respect to The Lap-

Band®, including the development of corrective and preventive action (CAPA) procedures to address nonconformance and quality issues.

 f. **21 C.F.R. § 820.30:**  The Lap-Band® Defendants were required to establish and maintain procedures for validating the design of The Lap-Band® that includes testing individual units under actual or simulated conditions, creating a risk plan, and conducting risk analyses.

 g. **Current Good Manufacturing Practices (CGMP):**  The Lap-Band® Defendants were required to follow quality systems to help ensure that their The Lap-Band® product consistently met applicable requirements and specifications.

32. The Lap-Band® Defendants generally had the ability to update the Lap-Band® labeling to include any newly acquired information regarding safety, without prior approval of the FDA 21 C.F.R. § 814.39(d).  The permitted changes to the label include:

 a. Any label change that strengthens or adds contraindications, warnings, or adverse reactions that have reasonable evidence of a causal association;

 b. Labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

 c. Labeling changes that delete misleading, false, or unsupported indications; and

 d. Labeling changes that reflect changes in quality controls or manufacturing processes that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

33. Not only did the Lap-Band® Defendants have the ability to update the Lap-Band® Labeling, the PMA for the Lap-Band® specifically required that the Lap-Band® Defendants provide supplemental warnings if unanticipated adverse effects, increases in the incidences of

anticipated adverse effects, or device failures necessitates a labeling, manufacturing or device modification.  The PMA for the Lap-Band® specifically provides:

> A PMA Supplement must be submitted when unanticipated adverse effects, increases in the incidences of anticipated adverse effects or device failures, necessitates a labeling manufacturing or device modification.

34. On April 27, 2010, Allergan, Inc. submitted its application for PMA supplement for the Lap-Band® Adjustable Gastric Banding System with the Center for Devices and Radiological Health (CDRH) of the FDA.  The supplement was submitted to expand the indication (people eligible) for the Lap-Band® Adjustable Gastric Banding System.  Because of this expansion of potential eligible patients, The Lap-Band® Defendants estimated more than 26 million Americans would be newly eligible for surgery.

35. On February 16, 2011, the CDRH approved the PMA supplement for the Lap-Band® Adjustable Gastric Banding System.  The Lap-Band® Defendants were required to complete the same requirements as when they were first approved, mentioned above.

36. From March 2012 to September 2015, the FDA cited The Lap-Band® Defendants for inadequate post-approval studies.  For the six month to four year reports, culminating a total of six reports, The Lap-Band® Defendants studies were only "On Time" once.  The five other times, the report was "Overdue."  Overall, the follow-up rate was below 80%.

### III. *The Lap-Band® Hazards*

37. In 2004, a study was conducted that showed many patients who receive laparoscopic gastric banding surgery for weight loss experience major complications over time, and as many as 60% of patients eventually have their band removed.  The study makes statements such as the adjustable gastric band "was used greatly in Europe, and became by far the most performed procedure before the first alarming signals appeared".  The study goes on to state "[t]he aim

of this paper, based on the longest existing follow-up, is to provide a warning".  Finally the study provides "its simplicity, the operation [d]espite its simplicity, the operation is not free from shortcomings; we encounter both early and late complications which required re-operative surgery in more than two-thirds of patients and device removal in more than one-half."  Camerin, G. Adam G. Masinari GM, et al.  Thirteen years of follow-up in patients with adjustable silicone gastric banding for obesity weight loss and constant rate of late specific complications.  Obes Surg 2004; 14: 1343-8.

38. In 2005, a study was conducted which showed that many patients who received laparoscopic gastric surgery for weight loss experience major complications over time. Suter, M., Calmes, J.M., Paros, A., Giusti, V. A 10-year experience with laparoscopic gastric banding for morbid Obesity:  high Long-Term Complications and failure rates.  Obes Sug 2005 16: 829-835.  This long term study showed that 33.1% of patients developed late complications, including band erosion of 9.5%, provide dilation/slippage of 6.3% and caterer or post-related problems of 7.6%.  Major reoperations was required in 21.7% of the patients.  The study goes on to note that the failure rate increased from 13.2% after 18 months to 23.8% at 3, 31.5% at 5 and 36.9% at 7 years.  The study states "we found the rate of long-term complications increases constantly over time, according to the linear pattern".  The study goes on to state this study "shows that a considerable time is needed to apprehend this high incidence of long-term complications after gastric banding.  The formable enthusiasm that embraced many surgeons during the late 1990s is now fading away, at least in Switzerland and in Europe".  The study goes on to warn:

> Laparoscopic gastric banding was introduced in the UA only a few years ago. As in Europe, and before the appearance of long-term complications, the enthusiasm related to the apparent simplicity and good early results might drive a considerable number of surgeons to

> choose gastric banding for morbid obesity. If long-term results
> mimic those reports in this paper, this could cause a disaster, with
> thousands of patients require reoperations, with the associated risks,
> because of sever long-term complications and/or insufficient weight.
> The result in this paper should serve as a warning.

39. In 2012, after issues surrounding the advertising and marketing of The Lap-Band® in

southern California, members of the United States Congress called for an investigation of the

safety and effectiveness of the Lap-Band® device.

40. The most recent labeling reports the results from the pivotal study and the "Lower BMI

Study" that was used to support the labeling change allowing use in patients with BMI as low

as 30. Those results show that in the pivotal study, over three years, approximately 25% of

the 299 study participants had their device removed. Approximately 17% of the 299 had the

device removed as a counter measure to an adverse event. Approximately 1.3% had the

device removed due to erosion.

41. In the Lower BMI study, the labeling reports that over one year, 1 out of 149, or 0.7% of

patients, suffered erosion. This patient, along with two others, or 2%, suffered a serious

adverse event requiring band removal.

42. A review of the entries in the FDA's MAUDE (Manufacturer and User Facility Device

Experience) database of adverse events reveals hundreds of instances of the Lap-Band®

causing erosion. The database contains a "manufacturer's narrative" in response to each of

the hundreds of complaint entries. The response to a report about erosion often contains

language such as the following:

> GASTRIC EROSION IS A SURGICAL/PHYSIOLOGICAL
> COMPLICATION AND ANALYSIS OF THE DEVICE GENERALLY
> DOES NOT ASSIST ALLERGAN IN DETERMINING A PROBABLE
> CAUSE FOR THESE EVENTS… DEVICE LABELING ADDRESSES THE
> POSSIBLE OUTCOME OF EROSION AS FOLLOWS…. "THERE IS A
> RISK OF BAND EROSION INTO STOMACH TISSUE…"

43. According to Allergan, 750,000 procedures have been performed between 1994 and 2013. In 2013 alone, there were 25,000 gastric band implantation surgeries. There were 358 adverse event reports (filed between 2013 and 2015) in the MAUDE database regarding events that took place in 2013, that mentioned erosion. Assuming that all 25,000 were The Lap-Band®s (and not Realize, the other adjustable gastric band on the market), that is a 1.4% rate of reported erosion events (in the same year as implantation). That matches the manufacturer's estimate derived from the pivotal study almost exactly.

44. The failure rate the Lap-Band® defendants reported in the MAUDE database is directly contradicted, however, by numerous medical studies which show that the number of patients whose Lap-Band® eventually erodes into the stomach is between 20% and 30% or higher. *See, e.g.*, Jacques Himpens et al, *Long-term Outcomes of Laparoscopic Adjustable Gastric Banding*, 146 ARCH. SURG. 802 (2011) (following up on patients who had received their The Lap-Band® between 1994 and 1997 in Europe prior to FDA approval, with a median follow-up time of 13 years, finding nearly 50% required removal and nearly 1 in 3 experienced erosion).

45. The story that starts to emerge is the following: Allergan knew that erosion was a significant risk long-term. It had studies that as early as 2002 suggested that erosion would be a problem for patients with long-term implants. It tried to cover up this risk by incorporating statements into the labeling it sought approval for that said things like "erosion is a risk" and "explanation may be necessary at any time." But it specifically appealed to the low percentage of erosion of 1.3% it allegedly found in the pivotal study.

46. Allergan's explanation for the high rates of erosion, such as in response to the 2011 Himpens study, has always been to blame the surgeon. Yet it also blamed the surgeons for the high

explanation rate in the pivotal trial of 25%—this was at the "beginning of their learning curve". If low surgical skill increases the risk of erosion, why would the pivotal trial, which Allergan said was less successful than otherwise because of low surgical skill, have only 1.3% erosion, while numerous subsequent trials found erosion rates between 3 and 30%?

47. The answer is that erosion increases with time. This makes sense—one of the leading theories (and most intuitively obvious) regarding the cause of erosion is the Lap-Band® necrosis. Put The Lap-Band® on tissue and it will reduce blood flow, causing it eventually to die. The longer The Lap-Band® is applied, the greater the extent of tissue death. The Lap-Band® is designed to put The Lap-Band® on tissue—that is how it works.

48. And Allergan knew all this. It had a duty to and did monitor the studies other sponsors conducted of gastric bands. We know this because it reported adverse events it learned of only through these outside studies to the FDA in the MAUDE database. However, it carefully managed its MAUDE submissions to ensure that the failure rate matched the failure rate it had previously reported to the FDA. The studies themselves that Allergan was using as a basis for its MAUDE reports found much higher rates of erosion, particularly at follow-up years after implantation. This is prima facie evidence that Allergan was violating federal law by underreporting adverse events, in a deliberate attempt to avoid having to update its label to reflect the true risks—and to avoid making clear to patients that they would most likely need to have the device removed because of an adverse event including stomach erosion.

49. If Allergan complied with federal law, it would have been known to the FDA and to the public that its labeling claims were false. Under its PMA, the Lap-Band® defendants were required to issue a new warning label when it had information indicating adverse events were worse than had been reported to the FDA. Moreover, the public would have known of the significant

risk of adverse events whether or not the FDA mandated labeling changes, because the MAUDE database is publicly available, and physicians and the media look at the MAUDE database. Finally, if the FDA had been notified of the true, significantly high rate of stomach erosion and subsequent need for removal, it would have changed the label.

50. Along these lines, the FDA's current assessment of two PMA-imposed mandatory post-approval studies (one a follow-up on the original trial and one a follow-up on the low BMI study) is that progress on these studies is "inadequate."

### IV. *Lap-Band® Representations*

51. At all relevant times, The Lap-Band® was researched, developed, manufactured, marketed, advertised, promoted, sold and distributed as a safe and effective device to be used for weight loss.

52. The Lap-Band® Defendants knew, and/or had reason to know, that the Lap-Band® was defective, unreasonably dangerous and not safe because of the high number of adverse events that both companies knew about.

53. Defendants negligently, carelessly, recklessly, and/or intentionally promoted the Lap-Band® to physicians and patients, including the Plaintiff and Decedent physicians.

54. The Lap-Band® Defendants downplayed to physicians and patients, including Plaintiff and Decedent physicians, the dangerous complications of long-term use of the Lap-Band®.

55. The Lap-Band® Defendants misrepresented the safety of the Lap-Band® to physicians and patients, including Plaintiff and Decedent physicians.

56. The Lap-Band® Defendants willfully and/or intentionally failed to warn and/or alert physicians and patients, including Plaintiff and Decedent physicians, of the increased risks and significant dangers resulting from being implanted with the Lap-Band® device.

57. The Lap-Band® Defendants knew and/or had reason to know, that their representations and suggestions to physicians that the Lap-Band® was safe and more effective than alternative weight loss methods were materially false and misleading such that physicians and patients, including Plaintiff and Decedent physicians, would rely on such representations.

58. The Lap-Band® Defendants knew or should have known and/or recklessly disregarded the materially incomplete, false and misleading nature of the information that they caused to be disseminated to the public and to physicians, including Plaintiff and Decedent physicians, as part of their campaign to promote the Lap-Band®.

59. Any warnings The Lap-Band® Defendants may have issued concerning the risks and dangers of the Lap-Band® were inadequate and insufficient in light of their contradictory prior, contemporaneous and continuing illegal promotional efforts of the Lap-Band® to hide or downplay the true risks and serious dangers of the device.

60. The ongoing scheme described herein could not have been perpetrated over a substantial period of time, as has occurred here, without knowledge and complicity of personnel at the highest levels of The Lap-Band® Defendants, including the corporate officers and directors.

61. The Lap-Band® Defendants knew and/or had reason to know of the likelihood of serious injuries caused by the promotion, sale, and distribution of The Lap-Band®, but they concealed this information and did not warn the FDA, Plaintiff and Decedent physicians, preventing Plaintiff and Decedent physicians from making informed choices in selecting alternative weight loss procedures prior to Plaintiff and Decedent Lap-Band® implantation procedure and preventing their physicians from timely discovering Plaintiff and Decedent injuries.

62. Plaintiff and Decedent would not have consented to undergo the Lap-Band® or would have had the Lap-Band® device removed prior to injury had Plaintiff and Decedent and their

physicians known of or been fully and adequately informed by The Lap-Band® Defendants of the true increased risks, hazards, and serious dangers of the Lap-Band®.

63. Plaintiff, Decedent and their physicians reasonably relied on The Lap-Band® Defendants' representations and omissions regarding the safety and efficacy of The Lap-Band®.

64. Plaintiff, Decedent and their physicians did not know of the specific increased risks and serious dangers, and/or were misled by The Lap-Band® Defendants, who knew or should have known of the true risks and dangers, but consciously chose not to inform Plaintiff and Decedent or their physicians of those risks and to actively misrepresent those risks and dangers to the Plaintiff, Decedent and their physicians. The Lap-Band® Defendants' promotion and marketing of the Lap-Band® caused Plaintiff and Decedent physicians to decide to recommend and implant the Lap-Band® in Plaintiff and Decedent.  Plaintiff and Decedent physicians would not have recommended and performed the Lap-Band® procedure, or would have provided different warnings regarding the risks of the procedure, and Plaintiff and Decedent would not have undergone the procedure, in the absence of Defendants' false and misleading promotion.

## V. *Damages Caused by Lap-Band®*

65. Plaintiff and Decedent have suffered serious personal injuries as a direct and proximate result of Lap-Band® Defendants' illegal misconduct.

66. As a direct and proximate result of Lap-Band® Defendants' illegal conduct, Plaintiff and Decedent have suffered and will continue to suffer from severe injuries and damages

67. As a result of Lap-Band® Defendants' failure to warn of the risks, dangers and adverse events associated with the Lap-Band® as manufactured, promoted, sold and supplied by Defendants,

and as a result of the negligence, callousness, and other wrongdoing and misconduct of Lap-Band® Defendants.

## VI.   *Lap-Band® Defendants Agency, Alter-Ego, Joint Venture, and Conspiracy*

68. At all times herein mentioned, Lap-Band® Defendants were fully informed of the actions of their agents, representatives, contractors, and/or employees, and thereafter, no officer, director or managing agent of the Lap-Band® Defendants repudiated those actions.  The failure to repudiate constituted adoption and approval of said actions, and Lap-Band® Defendants and each of them thereby ratified those actions.

69. At all times mentioned herein, there existed (and still exists) a unity of interest between certain Lap-Band® Defendants and other certain Lap-Band® Defendants such that any individuality and separateness between the certain Lap-Band® Defendants has ceased, and these Lap-Band® Defendants are the alter-egos of the other certain Lap-Band® Defendants and exerted control over those Defendants.

70. Each of the Lap-Band® Defendants herein expressly or impliedly agreed to work with and assist each other, Lap-Band® Defendants, and unnamed parties, toward the common purpose of promoting, recommending and selling the Lap-Band® and toward the common interest of pecuniary gain.

71. Each of the Lap-Band® Defendants herein performed the acts and omissions described herein in concert with the other Defendants herein and/or pursuant to a common design with the other Defendants herein.

72. Each of the Lap-Band® Defendants herein knew the acts and omissions of the other Defendants herein constituted a breach of duty, and yet, each Lap-Band® Defendant herein provided each other Lap-Band® Defendant substantial assistance and/or encouragement.

73. Each of the Lap-Band® Defendants herein provided substantial assistance to the other Defendants herein in accomplishing the intentional and tortious conduct described herein, and each of the Lap-Band® Defendants' conduct, even when separately considered, constitutes a breach of duties owed to the Plaintiff and Decedent and their physicians.

74. At all times herein mentioned, each of the Lap-Band® Defendants were engaged in the business of and/or were a successor in interest to and/or affiliated with/associated with/indistinguishable from entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing, advertising for sale, and/or selling the Lap-Band® device for use by the Plaintiff and Decedent and their physicians. As such, each of the Lap-Band® Defendants is individually, as well as jointly and severally, liable to the Plaintiff and Decedent for the Plaintiff and Decedent damages.

75. The conduct of the Defendants herein caused the Plaintiff and Decedent harm as described herein. The Plaintiff and Decedent harms are not in any way attributable to any fault of the Plaintiff and Decedent. Uncertainty may exist regarding which Defendant(s) and/or combination of Defendants caused the Plaintiff and Decedent harm. The Defendants possess superior knowledge and information regarding which Defendant(s) and/or combination of Defendants caused the Plaintiff and Decedent injuries. Thus, the burden of proof is upon each Defendant to prove the Defendant did not cause the Plaintiffs' harm as described herein.

76. Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiff and Decedent.

77. Due to the above, each Cause of Action named below is asserted against each Defendant herein, jointly and severally, even if each and every Defendant herein is not specifically identified as to each and every count.

## VII. *Plaintiffs' Experience with Lap-Band®*

78. During the removal of Decedent Rebecca Beardsley's Lap-Band® on December 27, 2018, it was noted that the Lap-Band® catheter had wrapped around her small intestines causing a bowel obstruction which necessitated emergency removal of the lap band and port. Decedent was found to have grossly necrotic small bowel and had patchy necrosis of the remainder of small bowel, active bleeding from short gastric veins, dusky liver, dusky ovaries bilaterally and distended but not grossly necrotic transverse colon.

79. During the surgery to remove the Lap-Band®, Decedent lost approximately 204 cm (6 feet) of her small bowel as well as most of her stomach and her spleen.

80. Even surgery could not resolve the damage caused by the Lap-Band and Decedent succumbed to her injuries on December 28, 2018 after suffering serious post-surgical consequences.

81. During the removal of Michele Kipnis' Lap-Band® on or about September 5, 2018 it was determined that the Lap-Band® had migrated, causing strangulation of her stomach and other organs, leading to sepsis, which prevented her from eating, caused daily vomiting, a hernia and chronic diarrhea. After the surgery to remove Plaintiff Kipnis' Lap-Band® she required 24 hour home care for six weeks to assist with all activities of daily living and the continued administration of oral antibiotics.

82. Despite the removal of the Lap-Band® Plaintiff Kipnis continues to suffer from a hernia which will require surgical repair, anemia, food intolerance, chronic diarrhea and scarring.

83. As a result of the infection and injuries caused by the Lap-Band®, Plaintiff Kipnis will have to undergo future surgery and on-going treatment for infections.

### COUNT I
### NEGLIGENT FAILURE TO WARN PHYSICIANS AND PATIENTS
**(Against Lap-Band® Defendants)**

84. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

85. At all relevant times, Lap-Band® Defendants were engaged in the business of designing, formulating, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising the Lap-Band® device for weight loss to Plaintiff, Decedent and their physicians.

86. The FDCA requires medical device manufacturers, such as Lap-Band® Defendants, to keep up to date on, and maintain a database of, injuries caused by their devices, known as adverse events.  21 U.S.C. § 360i. This includes establishing internal procedures for reviewing complaints and adverse event reports, 21 C.F.R. § 820.198(a).

87. Lap-Band® Defendants are also required to keep track of any adverse reactions, side effects or injuries caused by the Lap-Band® where the adverse event, side effect or injury has been addressed by the devices labeling but is occurring with unexpected severity or frequency.

88. The FDCA also requires medical device manufacturers to keep up to date on unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonable should be known to the applicant as well as reports in the scientific literature concerning the devices and known to, or that reasonably should be known to, the device manufacturer. 21 C.F. R. 814.84.

89. Medical device manufacturers such as Lap-Band® Defendants are required, in accordance with 21 U.S.C. § 352(q), to provide true and non-misleading statement in their advertising

and marketing to patients and their physicians. 21 U.S.C. § 352(q) provides that a medical

device is misbranded "if (1) its advertising is false or misleading in any particular, or (2) it is

sold, distributed, or used in violation of regulations prescribed under section 360j(e) of this

title." *Id.* Section 321(n) states that where there is an allegation of misbranding:

> [I]n determining whether the labeling or advertising is misleading there
> shall be taken into account (among other things) not only representations
> made or suggested by statement, word, design, device, or any
> combination thereof, **but also the extent to which the labeling or**
> **advertising fails to reveal facts material in the light of such**
> **representations or material with respect to consequences which may**
> **result from the use of the article**."

> 21 U.S.C. § 321(n)(emphasis added)

90. Lap-Band® Defendants have a parallel duty under Illinois state law to exercise reasonable

care to provide adequate and accurate warnings to physicians and their patients of

unreasonably dangerous conditions of the Lap-Band® device that were known, or knowable,

to Lap-Band® Defendants when they make any representations in their marketing and

advertising to physicians and their patients. Under Illinois state law, Lap-Band® Defendants

also have a duty to know and keep up date on research concerning the dangers and risks

involved with the use of their products and are considered to have the knowledge of experts

in their field.

91. In their marketing and advertising to patients and their physicians, Lap-Band® Defendants

made various false and misleading statements including that the Lap-Band® procedure is

"safer but just as effective as gastric bypass," "up to 10 times safer than gastric bypass" that

the Lap-Band® procedure is the "[o]nly surgical option designed to maintain long-term

weight loss," that the Lap-Band® system has "fewer risks and side effects" than gastric

bypass, that the Lap-Band® device/procedure is up to "10 times safer than gastric bypass," and that it has fewer risks and side effects than" gastric bypass.

92. Lap-Band® Defendants also stated in their marketing and advertising to patients and their physicians that the total number of complications for the Lap-Band® procedure are 9% while the total number of complications for gastric bypass are 23%, that major complication for the Lap-Band® procedure are 0.2% while major complication for gastric bypass are 2.1%.

93. In their marketing and advertising directed to patients and their physicians, Lap-Band® Defendants described the complication of Lap-Band® erosion as requiring "minor revisional surgery." Lap-Band® Defendants made this false claim and compared the Lap-Band® System to gastric bypass's complications of the "separation of stapled areas" or "leaks from staple lines" which Lap-Band® Defendants described as requiring "major revisional surgery."

94. None of these statements were approved by the FDA, they were not part of the FDA approved labeling, and the statements are demonstrably false. For instance, Lap-Band® Defendants statement that band erosion requires only "minor revisional surgery" is directly contradicted by the way band erosion is described in the Lap-Band® devices' warning label, approved by the FDA, which states that band erosion is a "serious adverse event," that "[r]e-operation to remove the devise is required', and that "[r]e-operation for band erosion may result in gastrectomy" – that is surgical removal of part or all of the stomach.

95. Lap-Band® Defendants statements in their marketing and advertising to physicians that the Lap-Band® has only a 9% total complication rate was never approved by the FDA and contradicted by numerous medical studies and by information Lap-Band® Defendants conveyed directly to the FDA in seeking approval to sell the Lap-Band®. Lap-Band®

Defendant stated to the FDA that in the results of their clinical trial, 89% of the subjects reported at least one adverse event, including 17% of the patients having to have their Lap-Band® removed.   Moreover, thirty-four percent (34%) of patients in the clinical study submitted to the FDA reported at least one "severe adverse event."  The FDA defines a "severe adverse event" as causing "severe discomfort such that patient cannot perform daily activities. Severity may result in cessation of treatment or required removal of the device, or treatment of symptoms may be given and/or patient hospitalized."

96. Lap-Band® Defendants support for their contention in their marketing and advertising to physicians and patients that the Lap-Band® has only a 9% total complication rate is one article - - O'Brien P, Dixon J. Lap-Band®: *Outcome and results, J. of Laparoendosc & Adv. Surg. Techniques*, 13(4), 2003, 265-270.   Lap-Band® Defendants citing only positive medical articles to support their contention is not only contradicted by what they told the FDA, there were, at the time these statements were made, numerous medical articles concluding the total complication rate was much higher than 9%. These actions by Lap-Band® Defendants are prohibited under federal law, e.g., 21 C.F.R. § 99.101, which allows a manufacturer to disseminate written information concerning the safety or effectiveness of the device that is not described in the labeling only if, among other things, it is not "false or misleading" 21 C.F.R. § 99.101(a)(4).  Moreover, information is considered false or misleading", "if, among other things, the information includes only favorable publications when unfavorable publications exist…" 21 C.F.R. § 99.101(a)(4).   These contentions by Lap-Band® Defendants also violate Illinois state law which prohibits false and misleading statements in advertising and that requires product manufacturers to disclose risks associated with their products that comprise an unreasonably dangerous condition.

97. Numerous medical studies indicate that Lap-Band® Defendants knew, or should have known, that the Lap-Band® had higher serious adverse event rates, including band erosion, re-operations rates and band removal and failure rates than those represented in their marketing and advertising directed to patients and their physicians. Moreover, these medical studies indicate that the Lap-Band® was not as effective or as safe as gastric bypass, directly contradicting advertising statements made by Lap-Band® Defendants.  Examples of these studies are set forth in this Complaint and, by way of example, several studies are set forth below.

98. In 2004, a study was conducted that showed many patients who receive laparoscopic gastric banding surgery for weight loss experience major complications over time, and as many as 60% of patients eventually have their band removed.  The study makes statements such as the adjustable gastric band "was used greatly in Europe and became by far the most performed procedure before the first alarming signals appeared." The study goes on to state "[t]he aim of this paper, based on the longest existing follow-up, **is to provide a warning**."  Finally the study provides "[d]espite its simplicity, the operation is not free from shortcomings; we encounter both early and late complications **which required re-operative surgery in more than two-thirds of patients and device removal in more than one-half**." Camerin, G. Adam G. Masinari GM, et al.  Thirteen years of follow-up in patients with adjustable silicone gastric banding for obesity weight loss and constant rate of late specific complications.  Obes. Surg. 2004; 14: 1343-8. (emphasis added).

99. In 2005, a study was conducted which showed that many patients who received laparoscopic gastric surgery for weight loss experience major complications over time. Suter, M., Calmes, J.M., Paros, A., Giusti, V. A 10-year experience with laparoscopic gastric banding for morbid

Obesity:  High Long-Term Complications and Failure Rates. Obes. Surg. 2005 16: 829-835. This long-term study showed that 33.1% of patients developed late complications, **including band erosion of 9.5%,** provide dilation/slippage of 6.3% and caterer or post-related problems of 7.6%.  Major reoperations were required in 21.7% of the patients.  The study goes on to note that the failure rate increased from 13.2% after 18 months to 23.8% at 3, 31.5% at 5 and 36.9% at 7 years.  The study states "we found the rate of long-term complications increases constantly over time, according to the linear pattern."  The study goes on to state this study "shows that a considerable time is needed to apprehend this high incidence of long-term complications after gastric banding.  The formable enthusiasm that embraced many surgeons during the late 1990s is now fading away, at least in Switzerland and in Europe."  The study goes on to warn:

> Laparoscopic gastric banding was introduced in the UA only a few years ago. As in Europe, and before the appearance of long-term complications, the enthusiasm related to the apparent simplicity and good early results might drive a considerable number of surgeons to choose gastric banding for morbid obesity.  If long-term results mimic those reports in this paper, **this could cause a disaster**, **with thousands of patients requiring reoperations**, with the associated risks, because of sever long-term complications and/or insufficient weight loss.  **The result in this paper should serve as a warning.**

Obes. Surg. 2005 16: 829-835 (emphasis added).

100. The Lap-Band® Defendants breached their duty to warn by failing to communicate to plaintiffs and their treating physicians in their advertising and marketing of the high numbers of adverse events involving the Lap Band device, and that medical researchers had concluded that the Lap Band device had a high failure rate, including a 9% Lap Band erosion rate and a 30 to 60% removal rate. Moreover, not only did Lap-Band® Defendants fail to communicate these warnings, they actively mislead physicians and patients concerning the safety and effectiveness of the device as noted herein.

101. Specifically, Lap-Band® Defendants breached these duties to warn Plaintiff, Decedent and their physicians, and violated federal and parallel Illinois state law, by:

    A. Failing to warn about and actively concealing complaints of perforations of the stomach, esophagus and bowel which were caused by the Lap-Band®;

    B. Failing to warn about and actively concealing instances of abdominal pain and infection;

    C. Failing to warn about and actively concealing complaints of the Lap-Band® migration;

    D. Failing to warn about and actively concealing instances of serious adverse events requiring the Lap-Band® removal;

    E. Failing to warn that the Lap-Band® device has an up to a 9% rate of erosion;

    F. Failing to warn that the Lap-Band® device has an up to 30 to 60% removal rate;

    G. Falsely claiming that the complication of Lap-Band® erosion only requires "minor revisional surgery";

    H. Falsely claiming the Lap-Band® device was "safer but just as effective as gastric bypass,"

    I. Falsely claiming the Lap-Band® device was "up to 10 times safer than gastric bypass;"

    J. Falsely claiming the Lap-Band® procedure is the "[o]nly surgical option designed to maintain long-term weight loss;"

    K. Falsely claiming the Lap-Band® device has "fewer risks and side effects" than gastric bypass; and

102. If Plaintiff and Decedent physicians and Plaintiff and Decedent had been provided with the warnings as described herein, and/or Plaintiff and Decedent physicians and Plaintiff and Decedents had not been misled about the safety and effectiveness of the Lap-Band® device as described herein, Plaintiff and Decedent would not have used the Lap-Band® or and Plaintiff and Decedent would not have suffered the injuries described in this Complaint. Alternatively, if Plaintiff and Decedent physicians had been either properly warned or not misled about the safety and effectiveness of the Lap-Band® device, Plaintiff and Decedent physicians would have provided different warnings to Plaintiff and Decedent and Plaintiff and Decedent would not have used the device and/or Plaintiff and Decedent physicians would have monitored Plaintiff and Decedent use of the device to prevent its erosion into their stomachs.

103. As a proximate and legal result of Lap-Band® Defendants' failure to warn Plaintiff and Decedent physicians and Plaintiff, and Decedent Lap-Band® Defendants breached their duty of care to Plaintiff and Decedent under federal and parallel state law and caused Plaintiff and Decedent past and future suffering, including severe physical injuries, economic losses and other damages for which they are entitled to compensatory and other damages in an amount to be proved at trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6.   such other relief and further relief as this Court may deem just and proper.

## COUNT II
## NEGLIGENT FAILURE TO WARN FDA
### (Against Lap-Band® Defendants)

104. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth

herein.

105. At all relevant times, Lap-Band® Defendants were engaged in the business of designing,

formulating, testing, manufacturing, producing, processing, assembling, inspecting,

distributing, marketing, labeling, promoting, packaging, and/or advertising the Lap-Band®

device for weight loss to Plaintiff  and Decedent and their physicians.

106. The FDCA requires medical device manufacturers, such as Defendants, to maintain and

submit information required by FDA regulation, 21 U.S.C. § 360i. This includes submitting

Adverse Reaction Reports, 21 C.F.R. § 803.50, and establishing internal procedures for

reviewing complaints and event reports, 21 C.F.R. § 820.198(a).

107. Lap-Band® Defendants also had a duty under Illinois state law to exercise reasonable care

to provide adequate and accurate warnings about the dangers and risks of the Lap-Band®

that were known, or knowable, to Lap-Band® Defendants at the time of the distribution of

the Lap-Band®.

108. According to the Conditions for Approval, Defendants have a continuing duty to monitor

the Lap-Band®.  Lap-Band® Defendants had a duty to submit reports to the FDA annually

including data on adverse events, and histological explants data following any removal

surgeries. Lap-Band® Defendants also have an ongoing duty to provide updated warnings

and instructions regarding risks associated with the Lap-Band®.

109. The Lap-Band® Defendants breached their duty to warn by failing to communicate to the FDA Adverse Event Reports prior to the time of Plaintiff and Decedent implant, thereby failing to warn Plaintiff and Decedent and their implanting physicians. By failing to warn the FDA through Adverse Event Reports of serious defects and complications described herein that Lap-Band® Defendants knew or should have known were associated with the Lap-Band®, Lap-Band® Defendants breached their duty to Plaintiff and Decedent and their implanting physicians.

110. The FDA publishes the adverse events and MDRs shared by manufacturers in a public, searchable database called MAUDE. The MAUDE database is updated monthly with "all reports received prior to the update." Had Lap-Band® Defendants timely and adequately reported the adverse events as required by federal and state law, additional information would have been available to Plaintiff and Decedent and/or Plaintiff and Decedent physicians regarding the dangers of the Lap-Band® that were known or knowable to Defendants at the time of Plaintiff and Decedent implant procedures.

111. Lap-Band® Defendants also had a parallel duty under state law to exercise reasonable care in warning the public and third parties about the risks and dangers of the Lap-Band® known or knowable to them at the time of Plaintiff and Decedent implant procedures.

112. Specifically, Lap-Band® Defendants breached these duties and violated federal law by:

    A.  Failing to report and actively concealing complaints of perforations of the stomach, esophagus and bowel which were caused by the Lap-Band®;

    B.  Failing to report instances of abdominal pain and infection;

    C.  Failing to report complaints of the Lap-Band® migration;

D.  Failing to report instances of serious adverse events requiring the Lap-Band®
removal;

E.  Failing to comply with the specific reporting requirements outlined in the PMA.

F.  Failing to submit an MDR within 30 days of becoming aware that the Lap-Band®
had broken into pieces; and

G.  Failing to disclose numerous complaints to the FDA as medical device reports.

113. If Lap-Band® Defendants had properly and timely reported the adverse events to the FDA,
it would have effectively warned physicians, including Plaintiff and Decedent physicians, of
those adverse events by, among other things, providing more complete information through
the FDA's MAUDE database.

114. If Plaintiff and Decedent had been aware of these adverse events, they would not have agreed
to the Lap-Band® implants and, upon information and belief, their physicians would not have
recommended the implants for them or would have provided different warnings and would
have monitored Plaintiff and Decedent use of the device to prevent its erosion into their
stomachs.

115. Lap-Band® Defendants negligently failed to comply with the above requirements and failed
to take the necessary actions, such as filing PMA supplements, updating the label pursuant to
21 C.F.R. § 820.39(d), or submitting MDRs, to timely advise the potential The Lap-Band®
users of the above- described defects and risks.

116. As a proximate and legal result of Lap-Band® Defendants' failure to comply with its PMA
and federal regulations and requirements, they breached their duty of care to Plaintiff and
Decedent under state law and caused Plaintiff and Decedent past and future suffering,

including severe physical injuries, economic losses and other damages for which they are entitled to compensatory and other damages in an amount to be proved at trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000)), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

## COUNT III
## NEGLIGENT MANUFACTURING
### (Against Lap-Band® Defendants)

117. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

118. Lap-Band® Defendants have a duty to manufacture the Lap-Band® consistent with specifications, PMA, and/or conditions of approval.  Specifically, under the FDCA, the Defendants are required to:

A. 21 C.F.R. §§ 820.20, 820.100: Lap-Band® Defendants failed to establish a quality management policy and instructions with respect to The Lap-Band®, including the development of corrective and preventive action (CAPA) procedures to address nonconformance and quality issues.

B. 21 C.F.R. § 820.30: Lap-Band® Defendants failed to "establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met." This includes "testing of production units under actual or simulated use conditions."

C. Current Good Manufacturing Practices (CGMP): Lap-Band® Defendants failed to follow quality systems to help ensure that their The Lap-Band® product consistently met applicable requirements and specifications. By failing to comply with the CGMP requirements, The Lap-Band® was rendered "adulterated" under section 501(h) of the FDCA.

D. 21 C.F.R. § 820.70: Lap-Band® Defendants failed to "develop, control, and monitor production processes to ensure that [The Lap-Band®] conforms to its specifications."

119. Lap-Band® Defendants also had a parallel duty under state law to exercise reasonable care in manufacturing their The Lap-Band® device to comply with the federal requirements, including the PMA, the device specifications, and applicable federal regulations.

120. Lap-Band® Defendants breached this duty by manufacturing actual The Lap-Band® devices that differ from the specifications set forth in the PMA, its Supplements, the Conditions of Approval and/or other federal regulations.

121. As a proximate and legal result of Lap-Band® Defendants' failure to manufacture the Lap-Band® devices consistent with federal requirements, Plaintiffs have suffered and will continue to suffer severe physical injuries, economic losses and other damages for which they are entitled to compensatory and other damages in an amount to be proved at trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

## COUNT IV
## NEGLIGENCE
### (Against Lap-Band® Defendants)

122. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

123. Lap-Band® Defendants were and are under a continuing duty to comply with federal requirements, including the PMA, its Supplements, the Conditions of Approval, and with the FDCA in the manufacture, development, design, marketing, labeling, distributing, and sale of the Lap-Band® and its implementing.

124. Lap-Band® Defendants concealed material information related to the safety of the Lap-Band® device and deceptively and falsely underreported the dangerous propensities and increased risks of the Lap-Band®.

125. Lap-Band® Defendants' Conditions of Approval expressly provided that "continued approval of this PMA is contingent upon the submission of post-approval reports required under 21 C.F.R. § 814.84…"

126. The information required to be submitted included, in part, information that is known or reasonably should be known to the applicant and shall include "unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices."

127. It was the duty of Lap-Band® Defendants to comply with federal law, the FDCA, the MDA and the regulations, notwithstanding this duty, Lap-Band® Defendants violated federal law, the FDCA, the MDA, and the regulations, including but not limited to, in one or more of the following ways:

A. 21 U.S.C. § 352(a) because Lap-Band® Defendants promoted for sale of misbranded and adulterated products because the Lap-Band® label is false and misleading because the Lap-Band® is not a safer and more effective method of weight loss than alternative methods, evidenced by numerous medical studies that indicate the over 10,000 reported adverse events consisting of that adverse events and serious medical complications occur at a higher rate than with other weight loss methods.

B. 21 U.S.C. § 331(a) because Lap-Band® Defendants introduced into interstate commerce a medical device that was misbranded, for the reasons set forth herein.

C. 21 U.S.C. § 352(q) because Lap-Band® Defendants created and distributed false and misleading advertising for the Lap-Band® because the Lap-Band® is not a safer and more effective method of weight loss than alternative methods, evidenced by numerous The Lap-Band® studies consisting of thousands of individuals reporting that patients who undergo the Lap-Band® procedure are more likely to

experience injuries and complications which require or will require surgical intervention or re-operation.

D. 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Lap-Band® Defendants failed to comply with the general quality control standards found in these regulations.

E. 21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because as discussed in detail above, Lap-Band® Defendants failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device breakage, perforation and erosion of the stomach wall and esophagus and surgical removal of the Lap-Band® device, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiff and Decedent to undergo surgical intervention to prevent further injury and/or may require Plaintiff and Decedent to undergo surgical intervention in the future to prevent further injury.

F. 21 C.F.R. § 814.84(b)(2) because as discussed in detail above, Lap-Band® Defendants failed to report new clinical investigations and/or scientific studies concerning the Lap-Band® device about which Lap-Band® Defendants knew or reasonably should have known about.

G. 21 U.S.C. §§ 360(q); 360(r) because Lap-Band® Defendants created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and

effectiveness of the Lap-Band® in order to convince physicians and patients to use the Lap-Band® over other methods of weight loss, thereby gaining market share.

H.  21 C.F.R. § 820.198 because Lap-Band® Defendants failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, erosion of the stomach wall and/or esophagus, infection and removal of the device.

I.  21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Lap-Band® Defendants (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of erosion of the stomach wall and/or esophagus, infection, device failure, and surgery to remove or attempt to repair/fix the device, which strongly indicated the Lap-Band® device was malfunctioning or otherwise not responding to its Design Objective Intent, which was to remain permanently in Plaintiff and Decedent body, and (2) Lap-Band® Defendants continued to sell the Lap-Band® into the stream of interstate commerce when they knew, or should have known, that the Lap-Band® was malfunctioning or otherwise not responding to its Design Objective Intent.

J.  21 C.F.R. § 814.80 because Lap-Band® Defendants manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

K.  21 C.F.R. § 820.30 because Lap-Band® Defendants failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited

to stomach and esophagus erosion, infection, device migration, and/or device fracture/breakage.

L. 21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Lap-Band® Defendants: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of stomach and esophagus erosion, infection, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

M. 21 C.F.R. § 820.70 because Lap-Band® Defendants failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of nonconforming products, including but not limited to stomach wall erosion, device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Lap-Band® device.

N. 21 C.F.R. § 814.39 because Lap-Band® Defendants failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the

numerous reported and unreported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of numerous individuals reporting that patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation.

128. As a direct and proximate result of Lap-Band® Defendants' violations of one or more of the above federal statutory and regulatory standards of care, the Lap-Band® device was implanted in Plaintiff, and Decedent was not removed from Plaintiff and Decedent prior to injury, and Plaintiff were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3. Plaintiffs were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

129. Lap-Band® Defendants failed to exercise reasonable care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of the Lap-Band®.

130. This cause of action is based entirely on the contention that Lap-Band® Defendants violated federal safety statutes and regulations. Plaintiffs do not bring the underlying action as an implied statutory cause of action, but rather Plaintiffs are pursuing parallel state common law claims based on Lap-Band® Defendants' violations of the applicable federal regulations. Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Lap-Band® Defendants' conduct violates these provisions. Rather Plaintiff and Decedent are alleging that Defendants' conduct that violates these provisions also violates parallel state laws.

131. Lap-Band® Defendants' violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence in tort under state common law.

132. Thus, for violation of federal law including but not limited to the FDCA, the MDA and relevant regulations which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

133. Lap-Band® Defendants owed Plaintiff and Decedent and Plaintiff and Decedent physicians the duty to exercise reasonable or ordinary care under the circumstances, in light of the generally-recognized and prevailing best scientific knowledge.

134. Lap-Band® Defendants had a confidential and special relationship with Plaintiff and Decedent due to their vastly superior knowledge of the health and safety risks relating to The Lap-Band®.

135. As a result, Lap-Band® Defendants had an affirmative duty to fully and adequately warn Plaintiff and Decedent and Plaintiff and Decedent physicians of the true health and safety risks related to the use of The Lap-Band®. Independent of any special relationship of confidence or trust, Lap-Band® Defendants had a duty not to conceal the dangers of The Lap-Band® from Plaintiff and Decedent and Plaintiff and Decedent physicians.

136. Misrepresentations made by Lap-Band® Defendants about the health and safety of The Lap-Band® independently imposed a duty upon Lap-Band® Defendants to fully and accurately disclose to Plaintiff and Decedent and Plaintiff and Decedent physicians the true health and safety risks related to The Lap-Band®.

137. Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Lap-Band® Defendants breached their duties to Plaintiff and Decedent and Plaintiff and Decedent physicians.

138. The following sub-paragraphs summarize, *inter alia*, Lap-Band® Defendants' breaches of duties to Plaintiff and Decedent and Plaintiff and Decedent physicians and describe categories of acts or omissions constituting breaches of duty by Lap-Band® Defendants. Each and/or any of these acts or omissions establishes an independent basis for their liability in negligence:

    A. Unreasonable and improper promotion and marketing of The Lap-Band® to physicians;

    B. Failure to warn the FDA, Plaintiff and Decedent and Plaintiff and Decedent physicians of the dangers associated with the increased risks and dangers of The Lap-Band®; or

    C. Failure to exercise reasonable care by not complying with federal law and regulations applicable to the manufacture, sale, and marketing of The Lap-Band®. Under federal law, Lap-Band® Defendants had a continuing duty to monitor the product after premarket approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences that are or may be attributable to the product.

139. Lap-Band® Defendants violated their duties under federal law to report adverse event information to the FDA. Because Lap-Band® Defendants failed to comply with their duty under federal law, they breached their duty to use reasonable care under parallel state laws.

140. Settled state common laws protect the safety and health of its citizens by imposing a general duty of reasonable care on product manufacturers. Moreover, state common laws include

causes of action for failure to warn. A product is unreasonably dangerous in the absence of adequate warnings under applicable state common laws.

141. Lap-Band® Defendants failed to use reasonable care and failed to adequately warn as to the increased risks and dangers of The Lap-Band®. As a result of these wrongful actions, the Plaintiff and Decedent were caused to suffer severe injuries and to incur significant damages.

142. Lap-Band® Defendants knew, or should have known, that due to their failure to use reasonable care, Plaintiff and Decedent and Plaintiff and Decedent physicians would use and did use The Lap-Band® to the detriment of Plaintiffs health, safety and well-being.

143. As the direct, producing, proximate and legal cause and result of Lap-Band® Defendants' negligence, Plaintiff and Decedent suffered severe injuries.

144. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

145. Lap-Band® Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and Decedent and warrants an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6.   such other relief and further relief as this Court may deem just and proper.

## COUNT V
## NEGLIGENCE PER SE
### (Against Lap-Band® Defendants)

146. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth

herein.

147. It was the duty of Lap-Band® Defendants to comply with federal law, the FDCA, the MDA

and the regulations, notwithstanding this duty, Lap-Band® Defendants violated federal law,

the FDCA, the MDA, and the regulations, including but not limited to, in one or more of the

following ways:

A. 21 U.S.C. § 352(a) because Lap-Band® Defendants promoted for sale of

misbranded and adulterated products because the Lap-Band® label is false and

misleading because The Lap-Band® is not a safer and more effective method of

weight loss than alternative methods, evidenced by the numerous reported adverse

events consisting of serious injuries, by the numerous The Lap-Band® studies

consisting of numerous people reporting that patients who undergo the Lap-Band®

procedure are more likely to experience injuries and complications which require

or will require surgical intervention or re-operation, and by the unreported

complaints contained in Lap-Band® Defendants' complaint files.

B. 21 U.S.C. § 331(a) because Lap-Band® Defendants introduced into interstate

commerce a medical device that was misbranded, for the reasons set forth herein.

C. 21 U.S.C. § 352(q) because Lap-Band® Defendants created and distributed false

and misleading advertising for the Lap-Band® which is a "Restricted Device"

because the Lap-Band® is not a safer and more effective method of weight loss

than alternative methods, evidenced by the numerous reported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies reporting that patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation.

D. 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Lap-Band® Defendants failed to comply with the general quality control standards found in these regulations.

E. 21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because Lap-Band® Defendants failed to inform and report and/or timely report adverse events to the FDA, including but not limited to, complaints of device migration, device fracture/breakage, perforation, erosion of the stomach wall, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiff and Decedent to undergo surgical intervention to prevent further injury and/or may require Plaintiff and Decedent to undergo surgical intervention in the future to prevent further injury.

F. 21 C.F.R. § 814.84(b)(2) because Lap-Band® Defendants failed to report new clinical investigations and/or scientific studies concerning the Lap-Band® device about which Lap-Band® Defendants knew or reasonably should have known about.

G. 21 U.S.C. §§ 360(q); because Lap-Band® Defendants created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of The Lap-

Band® in order to convince physicians and patients to use The Lap-Band® over other methods of weight loss, thereby gaining market share.

H. 21 C.F.R. § 820.198 because Lap-Band® Defendants failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, long-term chronic pain, and other quality problems associated with the Lap-Band® device.

I. 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Lap-Band® Defendants (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of erosion of the stomach wall and esophagus and/or device fracture/breakage, which strongly indicated the Lap-Band® device was malfunctioning or otherwise not responding to its Design Objective Intent, and (2) Lap-Band® Defendants continued to sell The Lap-Band® into the stream of interstate commerce when they knew, or should have known, that the Lap-Band® was malfunctioning or otherwise not responding to its Design Objective Intent.

J. 21 C.F.R. § 814.80 because Lap-Band® Defendants manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

K. 21 C.F.R. § 820.30 because Lap-Band® Defendants failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

L.  21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Lap-Band® Defendants: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

M.  21 C.F.R. § 820.70 because Lap-Band® Defendants failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of nonconforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Lap-Band® device.

N.  21 C.F.R. § 814.39 because Lap-Band® Defendants failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the numerous reported and unreported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of numerous reports that patients

who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by unreported complaints contained in Lap-Band® Defendants' complaint files.

148. As a direct and proximate result of Lap-Band® Defendants' violations of one or more of the above federal statutory and regulatory standards of care, the Lap-Band® device was implanted in Plaintiff and Decedent and Plaintiff and Decedent were caused to endure a serious injuries, as defined in 21 C.F.R. § 803.3.

149. Plaintiff and Decedent were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

150. Lap-Band® Defendants failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

151. Plaintiff and Decedent are not seeking to enforce these federal provisions in this action. Likewise, Plaintiff and Decedent are not suing merely because Lap-Band® Defendants' conduct violates these provisions. Rather Plaintiff and Decedent are alleging that Lap-Band® Defendants' conduct that violates provisions also violates parallel state laws.

152. Lap-Band® Defendants' violations of the aforementioned federal statutes and regulations establish a *prima facie* case of negligence in tort under state common law.

153. Thus, for violation of federal law including but not limited to the FDCA, the MDA and relevant regulations which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.  Lap-Band®

Defendants' violations of these federal statutes and regulations caused Plaintiff and Decedent injuries.

154. Plaintiff and Decedent' injuries resulted from an occurrence the laws and regulations were designed to prevent.

155. Plaintiff and Decedent are persons whom these statutes and regulations were meant to protect.

156. Lap-Band® Defendants' violations of these statutes or regulations constitutes negligence per se.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**(Against Lap-Band® Defendants)**

157. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

158. Lap-Band® Defendants made untrue representations and omitted material information to the FDA, Plaintiff and Decedent and Plaintiff and Decedent physicians by sponsoring biased

medical trials, reports, and articles that concluded that the risks and dangers of The Lap-Band® did not exist or were significantly less than the actual dangers.

159. Lap-Band® Defendants knew or should have known their representations were false when they were made.

160. Had Lap-Band® Defendants complied with their duties to the FDA as described under the Medical Device Reporting procedure, 21 C.F.R. § 803, the necessary and resultant actions by the FDA and/or appropriate government agencies, would have precluded the use of The Lap-Band®.

161. Plaintiff and Decedent and their physicians would not have chosen the Lap-Band® procedure as a method of weight loss had they known of the true safety risks related to The Lap-Band®.

162. Lap-Band® Defendants were negligent in making the untrue misrepresentations and omitting material information because Lap-Band® Defendants knew, or had reason to know, of the actual, unreasonable dangers and defects in their The Lap-Band® device.

163. Lap-Band® Defendants intended to induce Plaintiff and Decedent and their physicians to rely on their misrepresentations and omissions to use The Lap-Band® over the alternative methods of weight loss.

164. Plaintiff and Decedent and their physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to The Lap-Band® in deciding to undergo the Lap-Band® procedure for weight loss.

165. Plaintiff and Decedent their physicians were justified in their reliance on Lap-Band® Defendants' representations and marketing. Plaintiff and Decedent actually did undergo the

Lap-Band® implant procedure, which ultimately caused Plaintiff and Decedent serious physical injury.

166. In agreeing to undergo a procedure whereby the Lap-Band® was implanted, Plaintiff and Decedent and their physicians justifiably relied on such misrepresentations by Lap-Band® Defendants. As the direct, producing, proximate and legal cause and result of Lap-Band® Defendants' misrepresentations, Plaintiff and Decedent have suffered severe physical pain, medical and hospital expenses, pain and suffering, and pecuniary loss.

167. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

168. Lap-Band® Defendants' conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and Decedent and warrants an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

## COUNT VII
## STRICT LIABILITY – FAILURE TO WARN PHYSICIANS AND PATIENTS
### (Against Lap-Band® Defendants)

169. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

170. At all relevant times, Lap-Band® Defendants were engaged in the business of designing, formulating, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising the Lap-Band® device for weight loss to Plaintiff and Decedent and their physicians.

171. The FDCA requires medical device manufacturers, such as Lap-Band® Defendants, to keep up to date on, and maintain a database of, injuries caused by their devices, known as adverse events.  21 U.S.C. § 360i. This includes establishing internal procedures for reviewing complaints and adverse event reports, 21 C.F.R. § 820.198(a).  Lap-Band® Defendants are also required to keep track of any adverse reactions, side effects or injuries caused by the Lap-Band® where the adverse event, side effect or injury has been addressed by the devices labeling but is occurring with unexpected severity or frequency.

172. The FDCA also requires medical device manufacturers to keep up to date on unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonable should be known to the applicant as well as reports in the scientific literature concerning the devices and known to, or that reasonably should be known to, the device manufacturer. 21 C.F. R. 814.84.

173. Medical device manufacturers such as Lap-Band® Defendants are required, in accordance with 21 U.S.C. § 352(q), to provide true and non-misleading statement in their advertising and marketing to patients and their physicians. 21 U.S.C. § 352(q) provides that a medical

device is misbranded "if (1) its advertising is false or misleading in any particular, or (2) it is sold, distributed, or used in violation of regulations prescribed under section 360j(e) of this title." *Id.* Section 321(n) states that where there is an allegation of misbranding:

> [I]n determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, **but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article**."

> 21 U.S.C. § 321(n)(emphasis added)

174. Lap-Band® Defendants have a parallel duty under Illinois state law to exercise reasonable care to provide adequate and accurate warnings to physicians and their patients of unreasonably dangerous conditions of the Lap-Band® device that were known, or knowable, to Lap-Band® Defendants when they make any representations in their marketing and advertising to physicians and their patients. Under Illinois state law, Lap-Band® Defendants also have a duty to know and keep up date on research concerning the dangers and risks involved with the use of their products and are considered to have the knowledge of experts in their field.

175. In their marketing and advertising to patients and their physicians, Lap-Band® Defendants made various false and misleading statements including that the Lap-Band® procedure is "safer but just as effective as gastric bypass," "up to 10 times safer than gastric bypass" that the Lap-Band® procedure is the "[o]nly surgical option designed to maintain long-term weight loss," that the Lap-Band® system has "fewer risks and side effects" than gastric bypass, that the Lap-Band® device/procedure is up to "10 times safer than gastric bypass," and that it has fewer risks and side effects than" gastric bypass.

176. Lap-Band® Defendants also stated in their marketing and advertising to patients and their physicians that the total number of complications for the Lap-Band® procedure are 9% while the total number of complications for gastric bypass are 23%, that major complication for the Lap-Band® procedure are 0.2% while major complication for gastric bypass are 2.1%.

177. In their marketing and advertising directed to patients and their physicians, Lap-Band® Defendants described the complication of Lap-Band® erosion as requiring "minor revisional surgery." Lap-Band® Defendants made this false claim and compared the Lap-Band® System to gastric bypass's complications of the "separation of stapled areas" or "leaks from staple lines" which Lap-Band® Defendants described as requiring "major revisional surgery."

178. None of these statements were approved by the FDA, they were not part of the FDA approved labeling, and the statements are demonstrably false. For instance, Lap-Band® Defendants statement that band erosion requires only "minor revisional surgery" is directly contradicted by the way band erosion is described in the Lap-Band® devices' warning label, approved by the FDA, which states that band erosion is a "serious adverse event," that "[r]e-operation to remove the devise is required', and that "[r]e-operation for band erosion may result in gastrectomy" – that is surgical removal of part or all of the stomach.

179. Lap-Band® Defendants statements in their marketing and advertising to physicians that the Lap-Band® has only a 9% total complication rate was never approved by the FDA and contradicted by numerous medical studies and by information Lap-Band® Defendants conveyed directly to the FDA in seeking approval to sell the Lap-Band®. Lap-Band® Defendant stated to the FDA that in the results of their clinical trial, 89% of the subjects reported at least one adverse event, including 17% of the patients having to have their Lap-

Band® removed.   Moreover, thirty-four percent (34%) of patients in the clinical study submitted to the FDA reported at least one "severe adverse event."  The FDA defines a "severe adverse event" as causing "severe discomfort such that patient cannot perform daily activities. Severity may result in cessation of treatment or required removal of the device, or treatment of symptoms may be given and/or patient hospitalized."

180. Lap-Band® Defendants support for their contention in their marketing and advertising to physicians and patients that the Lap-Band® has only a 9% total complication rate is one article - - O'Brien P, Dixon J. Lap-Band®: *Outcome and results, J. of Laparoendosc & Adv. Surg. Techniques*, 13(4), 2003, 265-270.   Lap-Band® Defendants citing only positive medical articles to support their contention is not only contradicted by what they told the FDA, there were, at the time these statements were made, numerous medical articles concluding the total complication rate was much higher than 9%. These actions by Lap-Band® Defendants are prohibited under federal law, e.g., 21 C.F.R. § 99.101, which allows a manufacturer to disseminate written information concerning the safety or effectiveness of the device that is not described in the labeling only if, among other things, it is not "false or misleading" 21 C.F.R. § 99.101(a)(4).   Moreover, information is considered false or misleading", "if, among other things, the information includes only favorable publications when unfavorable publications exist…" 21 C.F.R. § 99.101(a)(4).   These contentions by Lap-Band® Defendants also violate Illinois state law which prohibits false and misleading statements in advertising and that requires product manufacturers to disclose risks associated with their products that comprise an unreasonably dangerous condition.

181. Numerous medical studies indicate that Lap-Band® Defendants knew, or should have known, that the Lap-Band® had higher serious adverse event rates, including band erosion, re-

operations rates and band removal and failure rates than those represented in their marketing and advertising directed to patients and their physicians. Moreover, these medical studies indicate that the Lap-Band® was not as effective or as safe as gastric bypass, directly contradicting advertising statements made by Lap-Band® Defendants.  Examples of these studies are set forth in this Complaint and, by way of example, several studies are set forth below.

182. In 2004, a study was conducted that showed many patients who receive laparoscopic gastric banding surgery for weight loss experience major complications over time, and as many as 60% of patients eventually have their band removed.  The study makes statements such as the adjustable gastric band "was used greatly in Europe and became by far the most performed procedure before the first alarming signals appeared."  The study goes on to state "[t]he aim of this paper, based on the longest existing follow-up, i**s to provide a warning**."  Finally the study provides "[d]espite its simplicity, the operation is not free from shortcomings; we encounter both early and late complications **which required re-operative surgery in more than two-thirds of patients and device removal in more than one-half**."  Camerin, G. Adam G. Masinari GM, et al.  Thirteen years of follow-up in patients with adjustable silicone gastric banding for obesity weight loss and constant rate of late specific complications.  Obes. Surg. 2004; 14: 1343-8. (emphasis added).

183. In 2005, a study was conducted which showed that many patients who received laparoscopic gastric surgery for weight loss experience major complications over time. Suter, M., Calmes, J.M., Paros, A., Giusti, V. A 10-year experience with laparoscopic gastric banding for morbid Obesity:  High Long-Term Complications and Failure Rates. Obes. Surg. 2005 16: 829-835. This long-term study showed that 33.1% of patients developed late complications, **including**

**band erosion of 9.5%,** provide dilation/slippage of 6.3% and caterer or post-related problems of 7.6%. Major reoperations were required in 21.7% of the patients. The study goes on to note that the failure rate increased from 13.2% after 18 months to 23.8% at 3, 31.5% at 5 and 36.9% at 7 years. The study states "we found the rate of long-term complications increases constantly over time, according to the linear pattern." The study goes on to state this study "shows that a considerable time is needed to apprehend this high incidence of long-term complications after gastric banding. The formable enthusiasm that embraced many surgeons during the late 1990s is now fading away, at least in Switzerland and in Europe." The study goes on to warn:

> Laparoscopic gastric banding was introduced in the UA only a few years ago. As in Europe, and before the appearance of long-term complications, the enthusiasm related to the apparent simplicity and good early results might drive a considerable number of surgeons to choose gastric banding for morbid obesity. If long-term results mimic those reports in this paper, **this could cause a disaster**, **with thousands of patients requiring reoperations**, with the associated risks, because of sever long-term complications and/or insufficient weight loss. **The result in this paper should serve as a warning.**

Obes. Surg. 2005 16: 829-835 (emphasis added).

184. The Lap-Band® Defendants breached their duty to warn by failing to communicate to plaintiffs and their treating physicians in their advertising and marketing of the high numbers of adverse events involving the Lap Band® device, and that medical researchers had concluded that the Lap Band® device had a high failure rate, including a 9% Lap Band® erosion rate and a 30 to 60% removal rate. Moreover, not only did Lap-Band® Defendants fail to communicate these warnings, they actively mislead physicians and patients concerning the safety and effectiveness of the device as noted herein.

185. Specifically, Lap-Band® Defendants breached these duties to warn Plaintiffs and their physicians, and violated federal and parallel Illinois state law, by:

A. Failing to warn about and actively concealing complaints of perforations of the stomach, esophagus and bowel which were caused by the Lap-Band®;

B. Failing to warn about and actively concealing instances of abdominal pain and infection;

C. Failing to warn about and actively concealing complaints of the Lap-Band® migration;

D. Failing to warn about and actively concealing instances of serious adverse events requiring the Lap-Band® removal;

E. Failing to warn that the Lap-Band® device has an up to a 9% rate of erosion;

F. Failing to warn that the Lap-Band® device has an up to 30 to 60% removal rate;

G. Falsely claiming that the complication of Lap-Band® erosion only requires "minor revisional surgery";

H. Falsely claiming the Lap-Band® device was "safer but just as effective as gastric bypass,"

I. Falsely claiming the Lap-Band® device was "up to 10 times safer than gastric bypass;"

J. Falsely claiming the Lap-Band® procedure is the "[o]nly surgical option designed to maintain long-term weight loss;"

K. Falsely claiming the Lap-Band® device has "fewer risks and side effects" than gastric bypass; and

186. If Plaintiff and Decedent physicians and Plaintiff and Decedent had been provided with the warnings as described herein, and/or Plaintiff and Decedent physicians and Plaintiff and Decedent had not been misled about the safety and effectiveness of the Lap-Band® device as described herein, Plaintiff and Decedent would not have used the Lap-Band® or and Plaintiff and Decedent would not have suffered the injuries described in this Complaint. Alternatively, if Plaintiff and Decedent physicians had been either properly warned or not misled about the safety and effectiveness of the Lap-Band® device, Plaintiff and Decedent physicians would have provided different warnings to Plaintiff and Decedent and Plaintiff and Decedent would

not have used the device and/or Plaintiff and Decedent physicians would have monitored Plaintiff and Decedent use of the device to prevent its erosion into their stomachs.

187. As a proximate and legal result of Lap-Band® Defendants' failure to warn Plaintiff and Decedent physicians and Plaintiff and Decedent, Lap-Band® Defendants breached their duty of care to Plaintiff and Decedent under federal and parallel state law and caused Plaintiff and Decedent past and future suffering, including severe physical injuries, economic losses and other damages for which they are entitled to compensatory and other damages in an amount to be proved at trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

## COUNT VIII
## STRICT LIABILITY – FAILURE TO WARN THE FDA
### (Against Lap-Band® Defendants)

188. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

189. Lap-Band® Defendants designed, formulated, tested, packaged, labeled, produced, created, assembled, advertised, manufactured, sold, distributed, marketed, and promoted The Lap-Band®, including the Lap-Band® devices that were implanted into Plaintiff and Decedent.

190. Lap-Band® Defendants at all times herein were medical device manufacturers and subject to the Medical Device Reporting regulations under 21 C.F.R. § 803.

191. Lap-Band® Defendants had a duty to warn the FDA about the dangers of the Lap-Band® device, which they knew, or in the exercise of ordinary care, should have known, at the time the Lap-Band® device left their control, pursuant to 21 C.F.R. § 803.50.

192. Lap-Band® Defendants did know of these increased risks and serious dangers and breached their duty by failing to warn the FDA of same.

193. Lap-Band® Defendants also had a "continuing obligation" to use "the exercise of reasonable care" in warning of potential dangers under parallel state law duties, which includes warning the FDA of dangers and adverse events associated with the Lap-Band® device that were known, or should have been known by Defendants at the time of distribution.

194. At the time the Lap-Band® devices left control of Lap-Band® Defendants when it was implanted into Plaintiffs, it was unreasonably dangerous due to non-compliance by both companies with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

   A. 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Lap-Band® Defendants failed to comply with the general quality control standards found in these regulations.

   B. 21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because Lap-Band® Defendants failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, device fracture/breakage,

perforation, erosion of the stomach wall, and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury.

C. 21 C.F.R. § 814.84(b)(2) because Lap-Band® Defendants failed to report new clinical investigations and/or scientific studies concerning the Lap-Band® device about which Lap-Band® Defendants knew or reasonably should have known about.

D. 21 C.F.R. § 820.198 because Lap-Band® Defendants failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, long-term chronic pain, and other quality problems associated with the Lap-Band® device.

E. 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Lap-Band® Defendants (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of device migration, stomach wall erosion and/or device fracture/breakage, which strongly indicated the Lap-Band® device was malfunctioning or otherwise not responding to its Design Objective Intent, and (2) Lap-Band® Defendants continued to sell The Lap-Band® into the stream of interstate commerce when they knew, or should have known, that the Lap-Band® was malfunctioning or otherwise not responding to its Design Objective Intent.

F. 21 U.S.C. §§ 360(q); 360(r) because Lap-Band® Defendants created and distributed false and misleading advertising, including but not limited to

representations and warranties regarding the risks, safety, recovery time, and effectiveness of The Lap-Band® in order to convince physicians and patients to use The Lap-Band® over other methods of weight loss, thereby gaining market share.

G. 21 C.F.R. § 814.80 because the Lap-Band® device was manufactured, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

H. 21 C.F.R. § 820.30 because Lap-Band® Defendants failed to establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

I. 21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Lap-Band® Defendants: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

J.  21 C.F.R. § 820.70 because Lap-Band® Defendants failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of nonconforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Lap-Band® device.

K.  21 U.S.C. § 352(a) because Lap-Band® Defendants promoted for the sale of misbranded and adulterated products because the Lap-Band® label is false and misleading because The Lap-Band® is not a safer and more effective method of weight loss than alternative methods, evidenced by the numerous reported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by unreported complaints contained in Lap-Band® Defendants' complaint files.

L.  21 U.S.C. § 352(q) because Lap-Band® Defendants created and distributed false and misleading advertising for The Lap-Band® which is a "Restricted Device" because The Lap-Band® is not a safer and more effective method of weight loss than alternative methods, evidenced by the numerous reported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by unreported complaints contained in Lap-Band® Defendants' complaint files.

M. 21 C.F.R. § 814.39 because Lap-Band® Defendants failed to submit and/or timely submit a PMA supplement and make a labeling change to add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association; such evidence is the numerous reported and unreported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the unreported complaints contained in Lap-Band® Defendants' complaint files.

195. As a direct and proximate result of Lap-Band® Defendants' violations of one or more of the above federal statutory and regulatory standards of care, the Lap-Band® device was implanted in Plaintiff and Decedent, Plaintiff and Decedent did not have the device removed prior to injury, and Plaintiff and Decedent were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3.

196. Plaintiff and Decedent were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

197. Lap-Band® Defendants failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

198. Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Lap-Band® Defendants' conduct violates these provisions. Rather

Plaintiffs are alleging that Lap-Band® Defendants' conduct that violates these provisions also violates parallel state laws.

199. Lap-Band® Defendants' violations of the aforementioned federal statutes and regulations establish a prima facie case of strict liability in tort under state common law.

200. Thus, for violations of federal law, including the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries, there already exists a money damages remedy under state common law.

201. The warnings accompanying the Lap-Band® device did not adequately warn Plaintiff and Decedent and their physicians, in light of Lap-Band® Defendants' scientific and medical knowledge at the time, of the increased risks and serious dangers associated with the Lap-Band® device, including but not limited to stomach wall erosion and infection.

202. In direct violation of 21 C.F.R. § 803.50 as well as State regulations and/or common law, Lap-Band® Defendants either recklessly or intentionally minimized and/or downplayed the risks of serious side effects related to The Lap-Band® when reporting to the FDA, including erosion of the stomach wall and/or esophagus and organ perforation.

203. The FDA was unaware of Lap-Band® Defendants' omissions and this led to Plaintiff and Decedent and their physicians' reliance on Lap-Band® Defendants' inadequate warnings in deciding to use The Lap-Band®.

204. Plaintiff and Decedent and their physicians did not and could not know of the specific increased risks and serious dangers of The Lap-Band®, and/or were misled by Lap-Band® Defendants, who knew of or should have known of the true risks and dangers of The Lap-Band® based on the number of complaints reported directly to them as well as the reports in the medical and scientific literature that they knew or should have known about.

205. Lap-Band® Defendants consciously chose not to inform the FDA, thereby preventing Plaintiff and Decedent and their physicians from having the information necessary to make an informed decision when deciding to recommend and undergo the Lap-Band® procedure.

206. The FDA publishes adverse events and MDRs in a public, searchable database called MAUDE and updates the report monthly with all reports received prior to the update.[1] The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

207. If Lap-Band® Defendants had met their duties under federal law and parallel state law, the FDA would have had the information necessary to warn the public, including Plaintiff and Decedent and their physicians, of the increased risks and serious dangers associated with The Lap-Band® in time to have lessened or prevent Plaintiff and Decedent injuries.

208. Additionally, if Lap-Band® Defendants had met their duty under 21 C.F.R. § 803.50, such information would have been made available to Plaintiff and Decedent and their treating physician, which would have allowed their treating physician to properly and/or timely diagnose the cause of Plaintiff and Decedent health problems.

209. As a direct and proximate result of one or more of the above listed dangerous conditions and defects, and of The Lap-Band® Defendants' failure to provide adequate warnings about them, as required under 21 C.F.R. § 803.50, Plaintiff and Decedent sustained serious injuries of a personal and pecuniary nature.

210. Plaintiff and Decedent have sustained extreme pain, suffering, and anguish and has otherwise suffered serious injuries and damages.

---

[1] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm

211. Lap-Band® Defendants' conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and Decedent and warrants an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000)), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

## COUNT IX
## STRICT LIABILITY – MANUFACTURING DEFECT
### (Against Lap-Band® Defendants)

212. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

213. A manufacturing defect cause of action is a claim that the product sold to the Plaintiff and Decedent was defective because it deviated from the original design and in its defective condition it caused the Plaintiff and Decedent injuries.

214. The original design for a Class III medical device is the product that is approved by the FDA. This FDA approval includes not only the physical components of the product, but the labeling and intended use of the product as well.

215. Under federal regulations, a product that does not comply with the FDA approval is considered "adulterated" and/or "misbranded." Under state law, a product that does not comply with the FDA approval is considered a "manufacturing defect." Therefore, any product sold that is not incompliance with the FDA approval is both misbranded and/or adulterated under federal law and a manufacturing defect under State common law. Therefore, the same underlying defect and/or actions of the manufacturer that have given rise to a federal violation are also a parallel state violation.

216. There are multiple manufacturing defects in the Lap-Band® device that were implanted into Plaintiff and Decedent which caused Plaintiff and Decedent device to erode their stomach walls  and/or break/fracture apart and/or caused Plaintiff and Decedent to experience infection amongst other side effects, all which became known to Lap-Band® Defendants.

217. As part of the FDA approval, a manufacturer must abide by general reporting requirements that are included in the conditions for approval. These conditions include reporting to the FDA any adverse events or new scientific findings about the product that are later learned of. The failure to do so violates the FDA approval. Given the nature of the information that is required to be reported in the conditions of approval and the relationship of the manufacturer to the FDA and ultimately to the consumer, reporting to the FDA provides reasonable assurance that the information will reach those whose safety depends on their having it. Here, not only did Lap-Band® Defendants not report required information, but they actively concealed such relevant safety information from the FDA, the medical community, and consumers, including Plaintiff and Decedent and their physicians.

218. Lap-Band® Defendants further violated federal law in the manufacture of The Lap-Band® in that they:

    A.  used non-conforming material;

    B.  failed to analyze or identify existing potential causes of non-conforming product and other quality problems;

    C.  failed to track the non-conforming product;

    D.  failed to follow procedures used to control products which did not conform to specifications;

    E.  failed to have complete Design Failure Analyses; and

    F.  failed to document CAPA activities for a supplier correction action.

219. Violating the conditions of approval for the FDA approval is another way of saying that the manufacturer violated the original design of the product and therefore creates a viable manufacturing defect claim.

220. The Lap-Band® devices implanted in Plaintiff and Decedent were not reasonably safe for the intended use and was defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Lap-Band® Defendants' design and manufacturing specifications in such a manner as to pose unreasonable increased risks of serious bodily harm to Plaintiff and Decedent.

221. The Lap-Band® devices manufactured and sold by Lap-Band® Defendants and implanted into Plaintiff and Decedent were defective in manufacture because they did not comply with Lap-Band® Defendants' own design specifications, used non-conforming material, and deviated from otherwise identical units from the same product line, manufactured with the same specifications.

222. At all times mentioned herein, Lap-Band® Defendants placed The Lap-Band® on the market and supplied the Lap-Band® device used during Plaintiff and Decedent procedures.

223. The Lap-Band® device that was implanted in Plaintiff and Decedent was promoted, distributed, manufactured and used in a manner that is in violation of federal law, the FDCA, the MDA, and regulations promulgated thereunder.

224. Lap-Band® Defendants have a duty to manufacture the Lap-Band® device consistent with the specifications, requirements, federal regulations, PMA, and/or conditions of approval. Lap-Band® Defendants breached this duty.

225. At the time the Lap-Band® devices left control of Lap-Band® Defendants when it was implanted into Plaintiffs, it was unreasonably dangerous due to non-compliance by both companies with the FDCA, and the regulations promulgated pursuant to it, including but not limited to, in one or more of the following ways:

    A. 21 U.S.C. § 352(a) because Lap-Band® Defendants promoted for the sale of misbranded and adulterated products because the Lap-Band® label is false and misleading because The Lap-Band® is not a safer and more effective method of weight loss than alternative methods, evidenced by numerous reported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the unreported complaints contained in Lap-Band® Defendants' complaint files.

    B. 21 U.S.C. § 331(a) because Lap-Band® Defendants introduced into interstate commerce a medical device that was misbranded, for the reasons set forth herein.

    C. 21 U.S.C. § 352(q) because Lap-Band® Defendants created and distributed false and misleading advertising for The Lap-Band® which is a "Restricted Device"

because The Lap-Band® is not a safer and more effective method of weight loss than alternative methods, evidenced by the numerous reported adverse events consisting of serious injuries, by the numerous The Lap-Band® studies consisting of patients who undergo the Lap-Band® procedure are more likely to experience injuries and complications which require or will require surgical intervention or re-operation, and by the unreported complaints contained in Lap-Band® Defendants' complaint files.

D. 21 C.F.R. § 820.3(z)(x), 21 C.F.R. § 820.22, 21 C.F.R. § 820.5, 21 C.F.R. §820.1(a), 21 C.F.R. § 820.22, 21 C.F.R. § 820.160(a), 21 C.F.R. § 820.198(a) and 21 C.F.R. § 820.170(a) because Lap-Band® Defendants failed to comply with the general quality control standards found in these regulations for the reasons set forth herein.

E. 21 C.F.R. § 803.50; 21 C.F.R. § 814.80, and 21 U.S.C. § 360i(a), because Lap-Band® Defendants failed to report and/or timely report adverse events, including but not limited to, complaints of device migration, stomach erosion, infection, re-operative, device removal and long-term chronic pain, all of which are serious injuries or may lead to a serious injury because such injuries required Plaintiffs to undergo surgical intervention to prevent further injury and/or may require Plaintiffs to undergo surgical intervention in the future to prevent further injury.

F. 21 C.F.R. § 814.84(b)(2) because Lap-Band® Defendants failed to report new clinical investigations and/or scientific studies concerning the Lap-Band® device about which Lap-Band® Defendants knew or reasonably should have known about..

G. 21 U.S.C. §§ 360(q); 360(r) because Lap-Band® Defendants created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of The Lap-Band® in order to convince physicians and patients to use The Lap-Band® over other methods of weight loss, thereby gaining market share.

H. 21 C.F.R. § 820.198 because Lap-Band® Defendants failed to establish and maintain procedures for implementing corrective and preventative action in response to, *inter alia*, complaints of, but not limited to, device migration, device fracture/breakage, perforation, long-term chronic pain, and other quality problems associated with the Lap-Band® device.

I. 21 C.F.R. § 820.198 and 21 C.F.R. § 803.3 because Lap-Band® Defendants (1) failed to appropriately respond to adverse incident reports, including but not limited to, reports of stomach wall and/or esophagus erosion, tissue necrosis and infection and/or device fracture/breakage, which strongly indicated the Lap-Band® device was not responding to its Design Objective Intent, and (2) Lap-Band® Defendants continued to sell The Lap-Band® into the stream of interstate commerce when they knew, or should have known, that the Lap-Band® was malfunctioning or otherwise not responding to its Design Objective Intent.

J. 21 C.F.R. § 814.80 because the Lap-Band® device was manufactured, packaged, stored, labeled, distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it.

K. 21 C.F.R. § 820.30 because Lap-Band® Defendants failed to establish and maintain procedures for validating the device design, including testing of production units

under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, upon obtaining knowledge of device failures including but not limited to perforation, device migration, and/or device fracture/breakage.

L. 21 C.F.R. § 820.100 because upon obtaining knowledge of device failure modes, Lap-Band® Defendants: (1) failed to routinely analyze complaints and other sources of quality data to identify existing and potential causes of nonconforming products or other quality problems and failed to use appropriate statistical methodology to detect recurring quality problems, including but not limited to, complaints of perforation, device migration, and/or device fracture/breakage; (2) failed to investigate the cause of nonconformities relating to product, processes, and the quality system; (3) failed to identify the action(s) needed to correct and prevent recurrence of such nonconforming product and other quality problems; and (4) failed to take any and all Corrective and Preventative Actions ("CAPA") necessary to address non-conformance and other internal quality control issues.

M. 21 C.F.R. § 820.70 because Lap-Band® Defendants failed to establish Quality Management Systems ("QMS") procedures to assess potential causes of non-conforming products, including but not limited to device migration, device fracture/breakage, and/or latent manufacturing defects, and other quality problems with the Lap-Band® device.

226. As a direct and proximate result of The Lap-Band® Defendants' violations of one or more of the above mentioned federal statutory and regulatory standards of care, The Lap-Band® was implanted in Plaintiffs and Plaintiffs were caused to endure a serious injury, as defined in 21 C.F.R. § 803.3.

227. Plaintiff and Decedent were caused to suffer, and will suffer in the future, injuries including, but not limited to pain, suffering, lost wages, disability, disfigurement, legal obligations for hospital, medical, nursing, rehabilitative, and other medical services and treatment.

228. Lap-Band® Defendants failed to act as a reasonably prudent Class III medical device manufacturer, distributor, and/or promoter.

229. Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because The Lap-Band® Defendants' conduct violates these provisions. Rather Plaintiffs are alleging that The Lap-Band® Defendants' conduct that violates these provisions also violates parallel state laws.

230. Lap-Band® Defendants' violations of the aforementioned federal statutes and regulations establish a *prima facie* case of strict liability in tort under state common law.

231. Thus, for violations of federal law, including, the FDCA, the MDA, and regulations promulgated thereunder which results in an unreasonably dangerous product proximately causing injuries there already exists a money damages remedy under state common law.

232. At all times herein mentioned, Lap-Band® Defendants had specific knowledge of the increased risks involved in the use of The Lap-Band®.

233. At all times herein mentioned, the Lap-Band® device produced serious side effects, including but not limited to stomach wall erosion, infection and severe chronic pain which required surgical intervention to remove the device or Lap-Band® Defendants knew or should have known that said usage could be unsafe because of said side effects.

234. At all times herein mentioned, Plaintiff and Decedent relied upon the misrepresentations of Lap-Band® Defendants and used the Lap-Band® product as promoted and instructed.

235. The Lap-Band® device, as given to Plaintiff and Decedent, was ineffective, defective, and unreasonably dangerous when manufactured, designed, promoted, and instructed by Lap-Band® Defendants, who are strictly liable for the injuries arising from its use. The increased risks and dangers attendant to the Lap-Band® device greatly outweighed the benefits to be expected from said use as promoted by Lap-Band® Defendants.

236. The Lap-Band® device failed to perform in a manner that a reasonable consumer would expect it to perform.

237. By placing The Lap-Band® on the market and promoting The Lap-Band® as the safest, most effective weight loss method available, Lap-Band® Defendants impliedly represented it was safe for the purpose intended, and intended that doctors and patients in the general public should rely on their misrepresentations. Plaintiff and Decedent and their doctors did rely on each of said misrepresentations and material omissions, all to their damage as hereinabove alleged.

238. In doing the things aforementioned, Lap-Band® Defendants are guilty of malice, oppression, and fraud, and Plaintiff and Decedent are therefore entitled to recovery of exemplary or punitive damages in the sum according to proof at trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000)), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6.   such other relief and further relief as this Court may deem just and proper.

## COUNT X
## COMMON LAW FRAUD
### (Against Lap-Band® Defendants)

239. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

240. Plaintiffs brings a claim against Lap-Band® Defendants for knowingly concealing information relative to the Lap-Band® device.

241. Lap-Band® Defendants committed fraud by concealing and/or making fraudulent representations during their promotional practices concerning the Lap-Band® device that were not approved by the FDA and/or the FDA premarket approval process.

242. In connection with the Lap-Band® product, Lap-Band® Defendants fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiff and Decedent and their physicians, that were not approved by the FDA and/or the FDA premarket approval process. The specifics regarding the content of the misrepresentations, when and where Lap-Band® Defendants made them, and to whom they were made, as well as what aspects of the statements were misleading and why, are alleged above in the body of this Complaint.

243. Plaintiff and Decedent and their physicians would not have decided to use The Lap-Band® or would have had the Lap-Band® removed prior to injury had they known of the real increased risks and dangers related to The Lap-Band® misrepresentation and/or fraud:

A. Any of the following is sufficient to independently establish defendant's liability for fraudulent Lap-Band® Defendants fraudulently concealed and misrepresented

the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with The Lap-Band®;

B. Lap-Band® Defendants fraudulently concealed and misrepresented information about the known increased risks and dangers as well as the limited benefits of the use of The Lap-Band® and the relative benefits and availability of alternate options.

244. As a medical device manufacturer, Lap-Band® Defendants had an affirmative continuing duty to warn the public, including Plaintiff and Decedent and their physicians regarding the increased risks and dangers they knew, learned, or should have known about associated with The Lap-Band®.

245. Had Lap-Band® Defendants complied with their duties to the FDA as described under the FDCA, the necessary and resultant actions by the FDA and/or appropriate government agencies would have precluded the use of the product in the surgeries giving rise to all causes of action.

246. Lap-Band® Defendants omitted material adverse information and provided inaccurate, false, or misleading information which was material to treating surgeons' treatment decisions, which misled surgeons and patients who were relying on those surgeons' professional judgment, including Plaintiff and Decedent and their treating surgeons.

247. Lap-Band® Defendants knew that use of The Lap-Band® was unreasonably dangerous and could lead to serious side effects as listed herein. Lap-Band® Defendants failed to take any measures whatsoever to alert surgeons or the public regarding increased risks and dangers and instead continued to promote the Lap-Band® device as safe, and further took action to conceal said information.

248. When Lap-Band® Defendants engaged in this deceptive campaign and made the above representations and/or omissions, they knew those representations and/or omissions to be false, or willfully and wantonly and recklessly disregarded whether the representations and/or omissions were true. These representations and/or omissions were made by Lap-Band® Defendants with the intent of defrauding and deceiving the public, including Plaintiff and Decedent, their physicians, and the medical community.

249. At the time the aforesaid representations and/or omissions were made by Lap-Band® Defendants, Plaintiff and Decedent and their medical providers were unaware of the falsity of said representations and/or omissions and reasonably relied upon Lap-Band® Defendants' assertions, promulgated through aggressive sales tactics as set forth herein, that the Lap-Band® device was safe when in fact it was not.

250. In reliance upon Lap-Band® Defendants' representations, Plaintiff and Decedent and their physician used The Lap-Band®.

251. As a direct and proximate result of said misrepresentations and/or material omissions, Plaintiff and Decedent physician used The Lap-Band®.

252. Had Plaintiff and Decedent physicians and/or Plaintiff and Decedent been made fully and adequately aware of the inefficacy and serious increased risks and dangers associated with such use, they would not have used it.

253. Had the FDA known of the actual dangers of and inefficacy of the use of The Lap-Band®, they would have initiated a recall of the product, dear doctor letter, or safety signal and/or warned the public of the dangers.

254. Lap-Band® Defendants' motive in failing to advise surgeons, the public, Plaintiff and Decedent, and the FDA of these increased risks was for financial gain and fear that, if they

provided proper and adequate information, The Lap-Band® would lose sales and market share.

255. Lap-Band® Defendants' conduct, as alleged above, was malicious, fraudulent, and oppressive toward Plaintiff and Decedent in particular and the public generally, and Lap-Band® Defendants conducted themselves in a willful, wanton, and reckless manner by actively violating federal regulations.

256. Lap-Band® Defendants are guilty of malice, oppression, and fraud, and Plaintiffs are therefore entitled to recovery of exemplary or punitive damages in sum according to proof at trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000)), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

## COUNT XI
## CONSTRUCTIVE FRAUD
### (Against Lap-Band® Defendants)

257. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

258. Lap-Band® Defendants marketed the Lap-Band® device to and for the benefit of Plaintiff and Decedent, and marketed it to their physicians, and Lap-Band® Defendants knew or had

reason to know of the unreasonable dangers and serious defects in The Lap-Band®, and that Plaintiff and Decedent and their physicians would use the product.

259. Lap-Band® Defendants owed Plaintiff and Decedent a duty to exercise reasonable or ordinary care under the circumstances, in light of the generally recognized and prevailing best scientific knowledge, and to produce and market The Lap-Band® in as safe a manner and condition as possible.

260. Specific defects, as specified above in this Complaint, in the Lap-Band® device rendered it defective and unreasonably dangerous.

261. Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Lap-Band® Defendants breached their duties to Plaintiff and Decedent. Such breaches exhibited willful and wanton conduct, and a reckless disregard for the safety of others.

262. By breaching their duties to Plaintiff and Decedent, Lap-Band® Defendants gained an advantage by wrongfully profiting from the sale of The Lap-Band®.

263. Plaintiff and Decedent and their physicians justifiably relied on Lap-Band® Defendants' misrepresentations and material concealment of the actual increased risks and dangers of The Lap-Band®.

264. As the direct, producing, proximate and legal cause and result of Lap-Band® Defendants' breach of their duties, Plaintiff and Decedent have suffered severe injuries, physical pain, and pecuniary loss and were otherwise seriously injured and damaged.

265. As the direct, producing, proximate and legal cause and result of Lap-Band® Defendants' breach of their duties, Plaintiff and Decedent have been injured and incurred damages, including but not limited to medical and hospital expenses, and pain and suffering.

266. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

267. Lap-Band® Defendants' conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiff and Decedent and warrants an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.

### COUNT XII
### FRAUDULENT CONCEALMENT
### (Against Lap-Band® Defendants)

268. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

269. In connection with their The Lap-Band® device, Lap-Band® Defendants fraudulently and intentionally concealed and suppressed material and important health and safety product risk information from the FDA, Plaintiff and Decedent and their physicians, all as alleged in this Complaint. Plaintiff and Decedent and their physician would not have used The Lap-Band®

for weight loss or would have had The Lap-Band® removed prior to injury had they known of the increased safety risks and dangers related to The Lap-Band®.

270. Either of the following is sufficient to independently establish Defendants' liability for fraudulent concealment:

271. Lap-Band® Defendants fraudulently concealed and misrepresented the increased health and safety risks, dangers, hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the Lap-Band® device to physicians, including Plaintiff and Decedent physicians; and

272. Lap-Band® Defendants fraudulently concealed and misrepresented material safety information about the known increased risks and dangers of the use of The Lap-Band® and the relative benefits and availability of alternate procedures.

273. Lap-Band® Defendants knew, or should have known, that they were concealing, suppressing, and misrepresenting true information about the known increased risks and benefits of the use of The Lap-Band® and the relative benefits and availability of alternate procedures.

274. Lap-Band® Defendants knew that Plaintiff and Decedent and their' physicians would regard the matters that they concealed, suppressed, and misrepresented to be important in determining the course of treatment for the Plaintiffs, including Plaintiff and Decedent and their physicians' decision whether or not to use The Lap-Band® as a weight loss procedure.

275. Lap-Band® Defendants intended to cause Plaintiff and Decedent and their physicians to rely on their concealment of material safety information, suppression, and misrepresentations about the increased risks and dangers related to The Lap-Band® as a method of weight loss.

276. Plaintiff and Decedent and their physicians were justified in relying, and did rely, on Lap-Band® Defendants' concealment of information and misrepresentations about the increased safety risks and dangers related to The Lap-Band® in deciding to recommend and choose the Lap-Band® procedure for weight loss.

277. As a direct and proximate result of Lap-Band® Defendants' fraudulent concealment, suppression, and misrepresentations of material increased health and safety risks and dangers relating to The Lap-Band® and Lap-Band® Defendants' promotion and marketing practices, Plaintiff and Decedent Plaintiff suffered injuries and economic loss, and Plaintiff and Decedent Plaintiff will continue to suffer injuries, damages and economic loss.

278. As the direct, proximate, and legal cause and result of Lap-Band® Defendants' false and deceptive marketing and promotion practices related to The Lap-Band®, Plaintiff and Decedent have been injured and have incurred damages, including but not limited to medical and hospital expenses, physical pain and suffering, and loss of the enjoyment of life.

279. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

280. Lap-Band® Defendants' conduct, as alleged above, was malicious, oppressive, intentional and/or reckless, outrageous, and constituted willful and wanton disregard for the rights and safety of others. Such conduct was directed specifically at Plaintiffs and warrants an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3.   costs of litigation;

4.   post-judgment interest;

5.   punitive or exemplary damages according to proof; and

6.   such other relief and further relief as this Court may deem just and proper.

## COUNTXIII
## BREACH OF EXPRESS WARRANTY
### (Against Lap-Band® Defendants)

281. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

282. The individual Lap-Bands® implanted in Plaintiffs was not manufactured and failed to conform to the FDA requirements imposed upon the Lap-Band® Defendants.

283. As a result, the representations, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

284. The Lap-Band® did not conform to the representations made by Lap-Band® Defendants.

285. At all relevant times, Plaintiff and Decedent used The Lap-Band® for the purpose and in the manner intended by Lap-Band® Defendants.

286. Plaintiff and Decedent and their physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its hidden increased risks and its unreasonable dangers.

287. Lap-Band® Defendants' breaches constitute violations of state common laws, including but not limited Mo. Rev. Stat. Ann §400.2–313 (2013).

288. The breach of the warranty was a substantial factor in bringing about Plaintiff and Decedent

injuries. As a direct and proximate result of Lap-Band® Defendants' acts and omissions,

Plaintiff and Decedent were implanted with the Lap-Band® device and suffered severe and

debilitating injuries, economic loss, and other damages, including but not limited to, cost of

medical care, rehabilitation, lost income, and pain and suffering for which they are entitled to

compensatory and equitable damages and declaratory relief in an amount to be proven at

trial.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly

and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000)), awarding:

1. economic and non-economic damages in an amount as provided by law and to be
   supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof; and

6. such other relief and further relief as this Court may deem just and proper.


### COUNT XIV
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
(Against Lap-Band® Defendants)

289. Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth

herein.

290. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/2, provides, in pertinent part as follows:

Unfair methods of competition and unfair deceptive acts or practices, including but
not limited to the use or employment of any deception, fraud, false pretense, false

promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any act in Section 2… in the conduct of any trade or commerce are hereby declared unlawful …

291. The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/109,

further provides in pertinent part as follows:

Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The Court, in its discretions, may award actual damages or any other relief which the Court deems proper … and may award, in addition to the relief provided in this Section, reasonable attorney's fee and cost to the prevailing party …

292. Plaintiff and Decedent purchased and used the Lap-Band® device for personal use and

thereby suffered damages as a result of Lap-Band® in violation of the State of Illinois

Consumer Fraud and Deception Business Practices Act, 815 ILCS 502/2 et seq. (hereinafter

"Illinois Consumer Fraud Act").

293. At all relevant times and as described herein, Lap-Band® Defendants knowingly directly

and indirectly represented to the FDA, to Plaintiff and Decedent, and to their physicians that

the Lap-Band® device was a safe and effective method of weight loss and weight

stabilization when compared to other alternatives, and that when used, it was not defective.

294. Lap-Band® Defendants' advertising, promotions, and representations contained therein

were false and misleading and constituted false or deceptive acts and practices declared

unlawful by the Illinois Consumer Fraud Act.

295. Lap-Band® Defendants' advertising, promotions, and representations contained therein

were false and misleading and constituted false or deceptive acts and practices which were

not approved by the FDA and/or the FDA premarket approval process, were not consistent

with FDA approved labeling and were also misleading or deceptive under Federal law.

296. Lap-Band® Defendants knowingly made false representations for the purpose of deceiving Plaintiff and Decedent, and their' physicians regarding the safety and efficacy of Lap-Band® in order to ensure the marketability and success of Lap-Band®, which was in violation of the Illinois Consumer Fraud Act.

297. Had Lap-Band® Defendants disclosed the true facts concerning the increased risks and damages they knew or should have known to be associated with Lap-Band®, the FDA would have required Lap-Band® Defendants to amplify its warning label, which would have lessened or prevented Plaintiff and Decedent injuries because theirs' physicians and Plaintiff and Decedent would not have chosen to recommend and undergo the Lap-Band® procedure.

298. Lap-Band® Defendants engaged in the unlawful practices set forth in this Complaint in the conduct of trade or commerce.

299. Lap-Band® Defendants' concealment, misrepresentations and/or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and Decedent regarding the Lap-Band®.

300. Lap-Band® Defendants engaged in the concealment, suppression, misrepresentations and/or omission of the material facts described herein with the intent that others, such as Plaintiff and Decedent, their physicians, and/or the general public, would rely upon the concealment, suppression, misrepresentation and/or omission of such material facts and purchase the Lap-Band®.

301. The concealment, suppression, misrepresentation and/or omission of the material facts described herein had the capacity to, was reasonably foreseeable that it would, and did so deceive.

302. Plaintiff and Decedent physicians would not have implanted the Lap-Band® in Plaintiff and Decedent and Plaintiff and Decedent would not have agreed to undergo the Lap-Band® procedure absent the misrepresentations, false pretenses, deception, concealment, suppression, or omission of the material facts described herein.

303. Plaintiff and Decedent suffered actual and ascertainable loss of money and damages as an actual and proximate result of Lap-Band® Defendants' intentional misrepresentation and concealment of material facts.

304. Lap-Band® Defendants' conduct described herein actually and proximately caused Plaintiff and Decedent to suffer damages as described throughout this Complaint.

305. Plaintiffs are entitled to recover their actual damages, punitive damages and attorneys' fees, and other equitable relief, pursuant to the Illinois Consumer Fraud Act.

306. Furthermore, Lap-Band® Defendants' unlawful conduct set forth in this Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of their actions and for the rights of Plaintiff and Decedent and warrants an award of punitive damages to deter Defendants, and others in similar circumstances, from committing such actions in the future.

WHEREFORE, Plaintiffs pray for judgment against the Lap-Band® Defendants, jointly and severally, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000), awarding:

1. economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

2. compensatory damages according to proof;

3. costs of litigation;

4. post-judgment interest;

5. punitive or exemplary damages according to proof;

6.  attorney's fees; and

7.  such other relief and further relief as this Court may deem just and proper.

## COUNT XIII
## WRONGFUL DEATH AGAINST ALL DEFENDANTS

COMES NOW Plaintiff, Joseph Beardsley, Individually, and as Special Administrator of the Estate of Rebecca Beardsley, by her attorneys, The Dysart Law Firm, P.C., and for his cause of action against the Defendants, states:

307. Plaintiff incorporates by reference all paragraphs of this complaint as if fully referenced herein.

308. At all relevant times in Illinois there existed a Wrongful Death Act, statutorily set forth at 740 ILCS 180/0.01, et seq.

309. At all times herein set forth, the Defendants' products were being employed in the manner and for the purposes for which they were intended and/or in a manner reasonably foreseeable and anticipated by the Defendants.

310. The Decedent's use of and injury from Defendants' products was completely foreseeable and could or should have been anticipated by the Defendants.

311. The Defendants knew or should have known of the dangers and/or risks presented by their products and the highly deleterious effect upon the health of persons using their products.

312. At all relevant times the Defendants owed a duty to the public, including Decedent, to exercise reasonable care and caution for the safety of those using the products of the Defendants.

313. The Defendants breached the duty they owed to the Decedent by, failing to disclose the risks involved in using their products, in failing to provide adequate instructions concerning

safe methods of use of the products, and failing to conduct tests on said products in order to determine the hazards to persons such as decedent.

314. As a direct and proximate result of the Defendants' breach, Decedent was injured by Defendants' product resulting in her death.

315. As a further result, the next of kin of the decedent have suffered great losses of a personal and pecuniary nature, including loss of companionship and society of the decedent, as well as grief, sorrow, and mental suffering subjecting the Defendants to liability.

WHEREFORE, Plaintiff, Joseph Beardsley as Special Administrator of the Estate of Rebecca Beardsley prays this Court to enter judgment in his favor and against these Defendants, jointly and severally, to award compensatory damages in excess of FIFTY THOUSAND DOLLARS ($50,000) and costs incurred prosecuting this matter, and to grant such other and further relief as this Court deems appropriate.

### COUNT XIV
### SURVIVAL ACTION
### (AGAINST ALL DEFENDANTS)

COMES NOW Plaintiff, Joseph Beardsley Individually and as Special Administrator of the Estate of Rebecca Beardsley, by his attorneys, and for his cause of action against Defendants states:

316. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

317. In addition to the recovery for wrongful death explained above, according to the survival statute, 755 ILCS 5/27-6, Plaintiff may recover for any claim that Decedent may have had against Defendants had death not ensued.  Accordingly, Plaintiff brings this survival action claim.

318. As a direct and proximate result of the aforementioned acts of Defendants, Decedent

suffered serious injuries of a personal nature, including but not limited to:  Decedent was

compelled to expend and became liable for large sums of monies for hospital, medical and

other health care services necessary for the treatment of her Lap-Band-related-injuries and

conditions and to alleviate the pain, suffering, mental anguish and physical disability caused

by his injury; Decedent experienced great physical pain and mental anguish as a result of said

injuries and conditions; that as a further result of her Lap-Band -induced injuries and

conditions, Decedent had a shortened life span; Decedent was hindered and prevented from

pursuing her normal course of employment, thereby losing large sums of money which

otherwise would have accrued to her, subjecting the Defendants to liability pursuant to 755

ILCS 5/27-6, commonly referred to as the Survival Statute.

WHEREFORE,  Plaintiff,  Joseph Beardsley Individually and as Special

Administrator of the Estate of Rebecca, prays this Court to enter judgment  in his favor and

against Defendants, jointly and severally, to award compensatory damages in excess of

FIFTY THOUSAND DOLLARS ($50,000) and costs incurred prosecuting this matter, and to

grant such other and further relief as this Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, respectfully demands judgment against Defendants, and each

of them, individually, jointly and severally and requests compensatory damages, together with

interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper

as well as:

A.  compensatory damages to Plaintiffs for past, present, and future damages,

including, but not limited to, and great pain and suffering for severe and

permanent personal injuries sustained by Plaintiff and Decedent, health and medical care costs, together with interest and costs as provided by law;

B.  for all ascertainable economic and non-economic damages in an amount as provided by law and to be supported by evidence at trial;

C.  for specific damages according to proof;

D.  for Punitive and Exemplary damages according to proof;

E.  for post-judgment interest as allowed by law;

F.  for the costs of these proceedings;

G.  for attorney fees under the Illinois Consumer Fraud Act; and

H.  for such other and further relief as this Court deems just and proper.

Respectfully submitted,

THE DYSART LAW FIRM, P.C.

By:  /s/ Christopher W. Dysart
Christopher W. Dysart, #06224351
16020 Swingley Ridge Rd., Ste. 340
Chesterfield, MO 63017
(314) 548-6298
cdysart@dysart-law.com
*Attorney for Plaintiffs*

Dated:  10.01.2020